**Opinion issued January 30, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

—————————————

**NO. 01-21-00331-CV**

—————————————

## IN THE ESTATE OF LARRY WAYNE EWERS, DECEASED

---

**On Appeal from the Probate Court No. 2**
**Harris County, Texas**
**Trial Court Case No. 483323**

---

## OPINION ON REHEARING

The appellant, Janice Barr Ewers, has moved for en banc reconsideration. We grant rehearing, withdraw our opinion and judgment of August 24, 2023, and substitute the following opinion and corresponding judgment in their stead. Our disposition remains unchanged, and we dismiss the appellant's motion for en banc reconsideration as moot in light of the withdrawal and substitution of the prior

opinion and judgment the motion addresses. *See, e.g.*, *Transamerica Occidental Life Ins. Co. v. Rapid Settlements, Ltd.*, 284 S.W.3d 385, 387 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (granting rehearing, withdrawing opinion and judgment and issuing new ones, and dismissing motion for en banc reconsideration as moot).

The trial court found that Larry Ewers committed fraud and unjust enrichment against Joseph Fauth, III and Prentice Cooper. Larry's widow and the independent administrator of his estate, Janice Barr Ewers, appeals. For the reasons discussed below, we modify the trial court's judgment to delete its finding that Green Energy Minerals LLC was Larry's alter ego and affirm the judgment as modified.

## BACKGROUND

In May of 2010, Cooper's accountant called him and asked if he would be interested in meeting someone who had some interesting investment opportunities. Cooper met with Larry and instantly liked him. As Cooper described, Larry's "demeanor was very, very good. He was friendly to everyone. He was always just being very courteous to people. He would be a wonderful friend." Cooper initially invested $200,000 in Larry's company.

Fauth knew Cooper from church. Cooper told Fauth that Larry was looking for investors and introduced them to each other. Fauth soon after invested $420,000 with Larry's company. Both Fauth and Cooper understood that they were investing in Larry's company, EPD Management Company, LLC ("EPD"), and that they were

buying an ownership interest in the company and would be entitled to proceeds of any future business deals that EPD made. Larry represented that EPD was involved in oil and gas speculation, something with which neither Fauth nor Cooper had any experience. Fauth had worked for Baker Hughes in its human resources department, and he later worked as a private consultant who trained managers and supervisors. Cooper owned a construction company.

### The Dewbre Deal and the Citadel Contracts

In early 2011, Larry approached Fauth and Cooper with a business prospect: if Larry could get the financing in place, his company, Citadel Exploration, LLC ("Citadel"), could purchase a portion of Dewbre Production, an oil and gas production company. The proposed deal with Dewbre Production was for Citadel to purchase a $52 million asset and pay it off in monthly installments over five years. During that time, Citadel would earn profits from the oil and gas that Dewbre Production sold, but most of those profits would go toward paying off the $52 million note. After five years, Citadel would own the asset outright and receive all of the profits, which Larry expected to be extremely lucrative.

Larry represented that he was struggling to get the financing in place, however. Enticed by the prospect of profiting from the deal, Fauth and Cooper agreed to loan Larry's company the needed money to make the initial down payment to fund the Dewbre deal. Both Fauth and Cooper signed nearly identical contracts in

3

March of 2011 memorializing this agreement—the Citadel contracts. In those contracts, Fauth and Cooper agreed to "roll over" their existing interest in EPD to Citadel in exchange for a six percent interest in the company and to loan Citadel an additional amount: $220,000 from Cooper and $400,000 from Fauth. Fauth cashed out his 401k to provide the money for the loan. Cooper also withdrew from his retirement savings. The Citadel contracts stated that Citadel would repay the loan amounts to Fauth and Cooper within 59 days.

The 59 days passed, but Citadel did not repay the loans to either Fauth or Cooper. Around that time, though, Larry invited Fauth and Cooper and their wives to a celebratory dinner in Corpus Christi because the Dewbre deal was closing. Fauth and Cooper believed they were set up to earn millions, and they were not concerned that their loans had not been repaid. As Fauth testified:

> [W]hen this [Dewbre] asset is paid off, it's worth $52 million. My 6 percent was worth over $3 million. On top of that, when the deal is paid off, now we're not making this $700,000 monthly note. I'm going to get 6 percent of that note, which is about $40,000 a month to the tune of over $500,000 a year. That was going to be my retirement income.

Within a few months, Larry began sending Fauth and Cooper monthly checks for their earnings from the Dewbre deal. The checks, written from EPD, were typically for a few thousand dollars and were sent with income statements detailing the money earned from production, less production expenses, and divided by the appellees' ownership percentage. This continued for several years. Cooper saved the

4

income statements because, as he put it, these were his "eagle eggs," meaning "here we've got something that's really good."

In 2014, the payments stopped. When the appellees asked why, Larry explained that the oil and gas market was down, so profits were reduced. Fauth testified, as he understood the situation:

> [T]he market had gotten soft on natural gas. And where we were having 3-dollar gas, the market was below $2; and I knew that that would be cutting into our revenue, our, you know, our sale of product. We still had an obligation to make our monthly note because the Dewbre deal was a 52-million-dollar asset. . . . [M]y investment was still solid because we were making enough production to pay the monthly note. We just—and whatever we did have left over, it was being placed into an escrow account, so I was told.

Cooper explained he was not concerned at the time:

> [O]nce we got this thing paid for, if it—if we only got what Larry— what was supposed to be being paid as a note, if that's all we got, and divided it by 6 percent, we're still doing great. So I had no problem with Larry taking the money and not giving us any at that time because I knew within five years it was going to be paid for and then we would have something that was worth right at $52 million.
>
> I considered Larry a friend. And he was going to do everything that he could to get back enough to where he was giving us our—or not giving us—but giving us—sending us our partnership percentage. I trusted him. . . . I trusted him because he was kind. He was considerate of other people.

Cooper understood that the note had been refinanced and was now going to take ten years to fully pay off. Fauth, like Cooper, was unconcerned:

> The reason I didn't do anything at that point is because [as] I understood the situation, our investment was still good. And we had already been

5

paying, to my knowledge, on a 52-million-dollar asset and we were getting close—closer to paying it off and starting all over.

They were still earning enough money to pay off the installments on the note for the Dewbre deal, Larry assured them, and any amount leftover he was placing into an escrow account to fund new business ventures. The appellees never received another payment from the Dewbre deal.

**New Business Ventures**

Over the next six years, Larry approached Fauth and Cooper with numerous new business ventures that were each "a potentially huge deal." These included some additional oil and gas ventures like purchasing depressed oil wells to "rework them and put them back online," but also ventures that involved some exciting new, confidential technology: mining rare earth minerals in Mongolia, refining contaminated drilling water into drinking water, filtering salt water into drinking water for "deprived areas around the world," eliminating brain cancer from excessive use of cell phones, and mining rare earth salts in Nebraska. Larry and Cooper took meetings with companies that were looking for investors, and in 2016, Larry invited Cooper to fly with him on a private jet to look at a potential mining opportunity in Nebraska and tour the mining facility. Also on that flight were Donald Weise and Robert Painter, two of Larry's business associates.

These new ventures were "a continuation of [Fauth and Cooper's] business dealings" with Larry, Fauth testified. As he understood it, Citadel had not used up

his initial investment, and that money together with the earnings from the Dewbre deal provided the "seed money" for new "business opportunities that were generated from that investment." Cooper also understood that these new opportunities were a continuation of their business dealings with Larry; Larry told them about new opportunities to let them know "that he was looking at other things, which was what [they] expected him to do."

Larry constantly emphasized the need for secrecy. In an email about a potential "mine to metal" deal, Larry wrote, "I ask this not be shared with ANYONE. If word leaked out it could cost us two deals." "[I]n all of our dealings," Fauth testified, "we were constantly told to keep it to ourselves, keep it close to the chest. If others find out about what we're doing, we would lose our advantage. The price would go down or they would get the project and we wouldn't." He, Cooper, and Larry had a "very tight circle of communication" and did not talk to anyone else about their potential deals.

Both Fauth and Cooper testified that they never invested money in any of these new business ventures.

### GEM and HELA

The last of these business ventures involved a startup company called HELA Novel Metals, LLC ("HELA"). Cooper testified that he understood HELA to be a company in its early stages that takes rare earth products and purifies them for use

7

in the automobile industry and by the Department of Defense. Larry purported to be one of the principals of HELA. Larry told Fauth and Cooper about the company because they were "partners, endeavoring to make more money," and HELA "was supposed to make millions . . . down the road." Larry claimed to have invested millions of dollars in HELA, purchasing laboratory equipment and paying rent for its laboratory. Larry sent Fauth and Cooper emails with photos of the equipment he purchased and an email with a "cashflow analysis" of the company, showing that it was going to make millions.

Larry did not invest directly in HELA. He and another person, Donald Weise, each agreed to contribute 50 percent of the capital in a new company, Green Energy Minerals LLC ("GEM"). Both Larry and Weise were co-managers of GEM. GEM in turn invested in HELA.

In an email to Fauth and Cooper providing updates about HELA, Larry again emphasized the need for secrecy:

> There are a lot of things discussed that I am not comfortable sending in a[n] e-mail. Tonight, most important thing we need to recognize is Secrecy [sic] is our best friend. My 3 am wake up call always includes a prayer that we recognize the importance of secrecy. . . . [M]y biggest fear is loose tongues. Like in the book of James, "small but powerful is the tongue, like a bit, a rudder, and a small fire[."] Don't mean to imply or insult anyone, but the tongue is our enemy. Enough of my preaching.

In December of 2019, Cooper, hoping to clarify some of his business dealings with Larry, recorded a meeting between himself and Larry. In the meeting, Larry

8

kept using the term "we": "Jesus, we've got a lot of money invested in these companies," and "We've got $11 million invested." Cooper testified he understood this to mean that Larry, Fauth, and himself through their joint business ventures had $11 million invested in HELA. The recording indicated that Larry tried to sell Cooper on the importance of taking a risk like investing in HELA:

MR. EWERS: My father-in-law used to tell me all the time, "If you're ever going to make it, you've got to take a leap of faith."

MR. COOPER: Oh, yeah.

MR. EWERS: If you don't take that leap of faith, you're just going to be working for another man.

MR. COOPER: That—I total—yeah. Because—because you're going to be working for wholesale prices—

MR. EWERS: That's it.

MR. COOPER: —for somebody else. And they're the ones that are going to make the money.

MR. EWERS: Uh-huh.

MR. COOPER: You've got to be willing.

MR. EWERS: You've got to be willing to take that leap—leap of faith. And this is a big leap, usually.

Cooper testified that statements like this meant a lot to him personally, because he was "a person of faith, and Larry was a person of faith. I think it's wonderful to be able to be with people of the same ideas and of the same feelings about God. And this man seemed to have a very good relationship with God[,] . . . and I appreciated it." And the HELA investment was going to pay off soon, Larry

9

said. "Ten tons a month is going to make us an unbelievable amount of money, unbelievable. It's—it's almost Monopoly money."

But around the same time as this meeting, Larry, who had been diagnosed with brain cancer, transferred his interest in GEM to his wife, Janice. Janice admitted that she paid no consideration for this transfer. She said she believed Larry was concerned for his health and wanted to provide for her in case something happened to him. She acknowledged the interest had no value at the time of his death or at the time of trial, but Larry wanted her to have it in case it did become valuable. If HELA does ever make a profit, she will be entitled to receive a distribution from the profits by virtue of this interest in GEM.

**Larry's Death and Court Proceedings**

Larry died in January of 2020. Janice was appointed the independent administrator of his estate. Only after Larry's death did Fauth and Cooper learn that the Dewbre deal had never closed. Fauth and Cooper each submitted claims against his estate in the amount of their total investments with Larry, minus the total amounts they had already received as payments from the purported Dewbre deal: $752,523.13 for Fauth and $572,573.13 for Cooper.

Janice, as independent administrator, denied these claims based on the statute of limitations. Fauth and Cooper filed an application to remove Janice as independent administrator. They also filed a lawsuit against Janice, individually and

10

as administrator of Larry's estate, for fraud and unjust enrichment. The case was tried to the bench. The trial court rendered judgment in favor of Fauth and Cooper against Larry's estate in the amounts of $752,523.13 and $572,573.13, respectively. The trial court ruled that Fauth and Cooper take nothing against Janice individually. The trial court filed findings of fact and conclusions of law. Specifically, the Court found:

- Fauth and Cooper invested a total of $820,000 and $640,000, respectively, with Larry's companies;

- Larry represented that their combined total investment of $1,460,000 was for the purchase of certain oil and gas leases from Dewbre Production;

- Larry never closed on the deal for the purchase of oil and gas leases from Dewbre, but he represented to Fauth and Cooper that the purchase of the Dewbre assets closed;

- From December 2011 through April of 2014, Larry sent Fauth and Cooper a combined total of $67,476.87 each in checks ostensibly for their share of the production from Dewbre along with itemized statements showing the alleged income and expenses from the Dewbre wells, but the checks were written from EPD, not Citadel;

- Larry represented to Fauth and Cooper that the payments from Dewbre stopped because of a depression in the price of oil and gas, and that the income from the Dewbre wells was instead going to building equity in the company;

- in order to prevent Fauth and Cooper from learning the Dewbre deal did not close, Larry represented to them that they were partners in his businesses and presented them with a series of investment opportunities he was considering investing their money and his money in;

- Larry presented these potential deals to Fauth and Cooper in order to prevent them from discovering the theft of their combined total investment of $1,460,000;

11

- Larry shared confidential information regarding GEM's investment with HELA as though they were parties with him in that investment;

- Larry sought to prevent Fauth and Cooper from investigating the alleged Dewbre production as well as their alleged interests in Larry's entities by telling them that confidentiality was of paramount importance, and Larry frequently cited scripture when stressing the importance of this confidentiality;

- in December of 2019, Larry transferred his interest in GEM to Janice, and no consideration was given in exchange for this transfer;

- Larry's interest in GEM has substantial value, and the holder of that interest will be entitled to reimbursement should HELA make a profit;

- Fauth and Cooper did not learn until after Larry's death that the Dewbre deal never actually closed;

- Janice had been appointed independent administrator of Larry's estate;

- Fauth and Cooper filed claims for $752,523.13 and $572,573.13, respectively, and Janice rejected both claims without comment;

- Janice's Inventory, Appraisement, and List of Claims showed the value of Larry's estate as $64,364.30; and

- Janice did not disclose the transfer of the GEM interest to the court.

The trial court concluded:

- Fauth and Cooper established a claim against Larry for fraud in the amounts of $752,523.13 and $572,573.13, respectively;

- Fauth and Cooper established a claim against Larry for unjust enrichment in the amounts of $752,523.13 and $572,573.13, respectively, because he represented their combined total investment was for the purchase of certain oil and gas leases from Dewbre but he used the money for the payment of his personal bills and expenses;

- Fauth and Cooper established they are entitled to a declaratory judgment the Citadel contracts were void, as they were part of a scheme to perpetrate fraud;

- the lawsuit was timely based on fraudulent-concealment tolling and the continuing-tort doctrine;

- Janice was incapable of performing her duties as independent administrator due to a material conflict of interest: her claim of ownership of Larry's interest in GEM; and

- Larry's transfer of his interest in GEM was a fraudulent transfer and therefore void.

The amended final judgment awarded $752,523.13 and $572,573.13 to Fauth and Cooper, respectively, in damages. The amended final judgment also ordered that Janice be removed from serving as independent administrator due to a material conflict of interest and that Larry's interest in GEM remain in Larry's estate as a result of the fraudulent transfer.

Janice now appeals.

## DISCUSSION

Janice has raised both legal and factual sufficiency challenges to several of the trial court's findings. She challenges the evidentiary sufficiency as to the trial court's findings on the following topics: (1) her limitations defense and the appellees' counter-defenses of fraudulent concealment and the continuing-tort doctrine; (2) elements of the appellees' claims, including justifiable reliance, damages, and unjust enrichment; (3) Larry's intent to defraud creditors by transferring his interest in GEM to her before he passed away; (4) whether she has a material conflict of interest as the independent administrator of Larry's estate,

necessitating her removal as administrator; and (5) whether GEM was Larry's alter ego. We address each of these evidentiary-sufficiency challenges in turn.

**Evidentiary Sufficiency Standards of Review**

When a party challenges the legal sufficiency of an adverse finding on an issue for which it had the burden of proof at trial, that party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). In reviewing such a matter-of-law challenge, we employ a two-part test. We first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id*. If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* The issue should be sustained only if the contrary proposition is conclusively established. *Id.*

When a party challenges the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof at trial, that party must demonstrate there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We will sustain a no-evidence challenge if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere

14

scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Evidence is conclusive only if reasonable people could not differ in their conclusions . . . ." *Wilson*, 168 S.W.3d at 816.

In reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the factfinder's decision and indulge every reasonable inference that would support it. *Id.* at 822. The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony, and it may choose to believe one witness and disbelieve another. *See id.* at 819. We may not impose our own opinion to the contrary. *Id.* "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

When a party challenges the factual sufficiency of an adverse finding on an issue for which it did not have the burden of proof at trial, we consider and weigh

15

all of the evidence and set aside the judgment only if the evidence that supports the finding is so weak as to make the judgment clearly wrong and manifestly unjust. *Figueroa v. Davis*, 318 S.W.3d 53, 59 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Again, the factfinder is the sole judge of witnesses' credibility and the weight to give their testimony; we may not impose our own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## I.     Limitations and Fraudulent Concealment

The trial court found that Larry procured the Citadel contracts through fraud, and on appeal this finding has not been challenged by Janice. Thus, the initial fraud in this case took place in March 2011. On appeal, Janice maintains that, assuming fraud for argument's sake, Fauth and Cooper knew or should have known of the alleged fraud no later than two months afterward, when Larry missed the initial 59-day payment deadline, or, at the very latest, in 2014, when Larry stopped paying Fauth and Cooper the ostensible profits from their investment in the Dewbre deal.

### A.     Applicable Law

The statute of limitations for a fraud claim is four years. TEX. CIV. PRAC. & REM. CODE § 16.004(a). The statute of limitations for an unjust-enrichment claim is two years. *Id.* § 16.003(a); *Elledge v. Friberg–Cooper Water Supply Corp.*, 240 S.W.3d 869, 871 (Tex. 2007) (per curiam) (holding Section 16.003's limitations for cause of action for "taking or detaining the personal property of another" applies to

unjust-enrichment claims). In general, a claim accrues and the limitations period on the claim begins to run when facts exist that authorize a claimant to seek judicial relief. *ExxonMobil Corp. v. Lazy R Ranch*, 511 S.W.3d 538, 542 (Tex. 2017).

Texas law recognizes two general exceptions to statutes of limitation: the discovery rule and fraudulent concealment. *See, e.g.*, *Petrol. Sols. v. Head*, 454 S.W.3d 482, 486 (Tex. 2014) (characterizing discovery rule and fraudulent concealment as "exceptions to the statute of limitations"); *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996) (recognizing two categories of exception to limitations: "those involving fraud and fraudulent concealment" and "all others"). Fraudulent concealment is the exception at issue in this appeal. But to understand fraudulent concealment, one has to understand how it resembles and differs from the discovery rule because Texas jurisprudence has not always been precise in distinguishing between the two exceptions. *See, e.g.*, *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997) (stating discovery rule "applies in cases of fraud and fraudulent concealment" and in other cases involving inherently undiscoverable injuries).

The two exceptions are similar in effect in that they both prevent limitations from barring claims that could not reasonably be brought in time. But the two exceptions exist for different reasons and often operate in different ways. *See, e.g.*, *Marcus & Millichap Real Est. Inv. Servs. of Nev. v. Triex Tex. Holdings*, 659 S.W.3d 456, 463 (Tex. 2023) (per curiam) (reiterating that though these exceptions are

similar in effect, fraudulent concealment "is a different doctrine that exists for different reasons"); *S.V.*, 933 S.W.2d at 4 (observing that these two categories of exception to limitations—discovery rule and fraudulent concealment—are distinct and "each is characterized by different substantive and procedural rules").

The discovery rule is a rule of accrual. *Weaver v. Witt*, 561 S.W.2d 792, 793–94 (Tex. 1977) (per curiam). When the nature of an injury is inherently undiscoverable and the evidence of injury is objectively verifiable, the discovery rule defers accrual of a cause of action until the plaintiff knew or should have known of the facts giving rise to the cause of action. *E.g.*, *Archer v. Tregellas*, 566 S.W.3d 281, 290 (Tex. 2018). An injury is inherently undiscoverable if it is unlikely to be discovered within limitations despite diligence. *Id.* This determination is categorical in nature, meaning that the court assesses whether the type of injury in question could be discovered through the exercise of reasonable diligence, rather than basing this determination on the particular facts of a given case. *See id.* (explaining that issue was not whether particular parties before court could have discovered their injury with diligence, but whether their injury was kind of injury that could be discovered through exercise of reasonable diligence in general). Thus, inherent undiscoverability presents a question of law. *See Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (per curiam) (declaring inquiry as to whether injury is

inherently undiscoverable is "legal question" to be "decided on a categorical rather than case-specific basis" with focus on whether type of injury is discoverable).

Fraudulent concealment tolls limitations, rather than deferring accrual. *Emerald Oil*, 348 S.W.3d at 203, 209. When a defendant conceals his wrongdoing, the doctrine of fraudulent concealment may toll statutes of limitation after a cause of action has accrued. *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011); *see also Draughon v. Johnson*, 631 S.W.3d 81, 95 (Tex. 2021) (specifying that fraudulent concealment is independent ground "for avoiding dismissal even if the limitations period has expired"). The rationale for the doctrine rests in Texas's longstanding recognition that fraud vitiates whatever it touches, so that a defendant may not avail himself of limitations when his own fraud prevents the other side from seeking redress within limitations. *Valdez v. Hollenbeck*, 465 S.W.3d 217, 230 (Tex. 2015) ("Texas courts have long recognized that 'fraud vitiates whatever it touches,' and we have consistently held that "'a party will not be permitted to avail himself of the protection of a limitations statute when by his own fraud he has prevented the other party from seeking redress within the period of limitations.'"); *see also Borderlon v. Peck*, 661 S.W.2d 907, 908–09 (Tex. 1983) (explaining that applying limitations as bar to claim under these circumstances would make statute of limitations means of encouraging fraud). In this manner, the doctrine of fraudulent concealment resembles equitable estoppel, precluding fraudsters from relying on a

19

plaintiff's untimeliness in bringing a claim as a defense when the delay is attributable to their own fraud. *See Marcus & Millichap*, 659 S.W.3d at 463 (restating that fraudulent concealment resembles equitable estoppel and estops defendant from relying on statute of limitations as affirmative defense to plaintiff's claim).

Unfortunately, courts and practitioners alike sometimes use language that risks conflating the two exceptions by erroneously suggesting fraudulent concealment is a doctrine that defers accrual, or the discovery rule is a rule that tolls limitations. *See, e.g.*, *DiGrazia v. Old*, 900 S.W.2d 499, 504 (Tex. App.—Texarkana 1995, no writ) (explaining that parties had confused discovery rule, which determines when cause of action accrues, with fraudulent concealment, which does not affect when limitations period begins to run but instead tolls running of limitations period after it has begun to run); *see also Am. Star Energy & Mins. Corp. v. Stowers*, 457 S.W.3d 427, 435 n.5 (Tex. 2015) (reiterating that deferring accrual of claim, which delays commencement of limitations period, is distinct from tolling running of limitations once period has begun). But just as the proof of the pudding is in the eating, the proof of the law is in its practice, and longstanding summary-judgment practice demonstrates that the discovery rule is a rule of accrual and fraudulent concealment is not. *See Weaver*, 561 S.W.2d at 793–94 (holding movant seeking summary judgment based on limitations must negate discovery rule, when pleaded, because discovery rule determines when nonmovant's claim accrued,

whereas fraudulent concealment is affirmative defense to limitations on which nonmovant bears burden of adducing evidence to avoid summary judgment); *see, e.g.*, *Houston Endowment v. Atl. Richfield Co.*, 972 S.W.2d 156, 159, 163 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (identifying discovery rule, when pleaded, as test to determine when nonmovant's claim accrued and holding summary-judgment movant had burden to negate discovery rule but that nonmovant bore summary-judgment burden to raise fact issue on fraudulent concealment).

Further, unlike the discovery rule and its categorical approach to inherent undiscoverability, fraudulent concealment "is a fact-specific equitable doctrine that tolls limitations until the fraud is discovered or could have been discovered with reasonable diligence." *Valdez*, 465 S.W.3d at 229; *see also Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 736 (Tex. 2001) (remarking that party's alleged misrepresentation of information in particular lawsuit may be relevant to fraudulent-concealment analysis but would not affect court's categorical evaluation of inherent undiscoverability under discovery rule). Like equitable estoppel itself, whether the doctrine of fraudulent concealment estops a defendant from relying on the affirmative defense of limitations necessarily turns on the particular facts of each case. *See Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d 834, 838 (Tex. 1968) (saying so with respect to equitable estoppel).

To defeat limitations based on the doctrine of fraudulent concealment, a plaintiff must prove that the defendant actually knew a wrong occurred, had a fixed purpose to conceal the wrong, and did conceal the wrong. *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 927 (Tex. 2011). When, as here, a plaintiff alleges the defendant fraudulently concealed the wrong through affirmative misrepresentations, the plaintiff must also prove that he relied on the defendant's misrepresentations and his reliance was reasonable under the circumstances. *Marshall*, 342 S.W.3d at 68; *see also B. Mahler Interests v. DMAC Constr.*, 503 S.W.3d 43, 54–55 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (listing *Ross*'s three elements—defendant's actual knowledge of wrong, fixed purpose to conceal it, and actual concealment—and elaborating based on *Marshall* that plaintiff must also prove reasonable reliance when he alleges fraudulent concealment based on fraudulent representations).

As the doctrine's language concerning discovery and diligence indicate, fraudulent concealment does not forestall the running of limitations indefinitely. *Valdez*, 465 S.W.3d at 230. The estoppel effect of fraudulent concealment ceases when one gains actual knowledge of the fraud or learns of circumstances that would prompt a reasonably prudent person to make an inquiry that, if pursued, would unearth the fraud. *See id.* (reciting that knowledge of circumstances that would prompt reasonable person to make investigation that would uncover basis for cause of action "is in law equivalent to knowledge of the cause of action"); *Hooks v.*

22

*Samson Lone Star*, 457 S.W.3d 52, 59 (Tex. 2015) (noting that limitations runs irrespective of fraudulent concealment if party knows of injury-causing conduct). The discovery rule ceases to operate under like circumstances. *See Emerald Oil*, 348 S.W.3d at 203 (relating that knowledge of "alleged wrongful actions and that those actions cause problems or injuries" defeats discovery rule and fraudulent concealment); *Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex. 1997) (per curiam) (noting that discovery rule and fraudulent concealment apply only until wrong "is discovered or could have been discovered with reasonable diligence").

In this way, fraudulent concealment resembles the discovery rule in that they both focus on discovery of the wrong and reasonable diligence to determine when the exceptions no longer toll limitations or defer accrual, respectively. *See Valdez*, 465 S.W.3d at 229 (articulating that fraudulent concealment "tolls limitations until the fraud is discovered or could have been discovered with reasonable diligence"); *Kerlin v. Sauceda*, 263 S.W.3d 920, 925 (Tex. 2008) (indicating fraudulent concealment does not apply after "the plaintiff discovers the wrong or could have discovered it through the exercise of reasonable diligence" and noting discovery rule likewise "does not apply to claims that could have been discovered through the exercise of reasonable diligence"). In either case, the issues of discovery and diligence ordinarily present questions of fact for the factfinder, rather than matters of law for the court. *See Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699,

23

722 (Tex. 2016) (advising that "reasonable diligence is an issue of fact" in case addressing applicability of discovery rule); *Hooks*, 457 S.W.3d at 57–58 (instructing that "reasonable diligence is an issue of fact" in case discussing effect of fraud and fraudulent concealment on limitations). Unless reasonable minds cannot differ on issues like discovery of the wrong and reasonable diligence, these issues are for the factfinder to resolve. *See Hooks*, 457 S.W.3d at 58 n.7 (citing decisions standing for proposition that whether plaintiff knew or should have known of fraud, including whether he exercised reasonable diligence, are ordinarily fact issues).

Fraudulent concealment may be proved by direct or circumstantial evidence, of course. *Earle v. Ratliff*, 998 S.W.2d 882, 888 (Tex. 1999). Where evidence regarding reasonable diligence is concerned, the law takes into account the sophistication of the parties, at least to the extent the record reflects that the party relying on fraudulent concealment is more sophisticated than usual. *See Hooks*, 457 S.W.3d at 57–59 (discussing one prior decision—*Ross*—in which party was attorney who understood oil and gas industry and another decision—*Marshall*—in which party was also sophisticated and knowledgeable about oil and gas industry). In general, however, evidence of reasonable diligence is evaluated under an objective standard of reasonableness, not a subjective one. *See, e.g.*, *Trousdale v. Henry*, 261 S.W.3d 221, 234 n.4 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)

(remarking that discovery rule and fraudulent concealment doctrine both measure what parties should have known under objective, not subjective, standard).

Outside of fiduciary relationships, reasonable diligence requires a party to protect his rights in dealings with others, which may include making inquiries needed to safeguard those rights. *See Via Net*, 211 S.W.3d at 314 (advising that due diligence may include asking other party to contract for information needed to verify performance). But if another responds with false information, the doctrine of fraudulent concealment may toll limitations. *See id.* Indeed, as explained, the doctrine's very purpose is to prevent bad actors from perpetrating a fraud and then perpetuating this fraud through concealment or still more fraud until the applicable statutes of limitation bar their victims' claims. *See Borderlon*, 661 S.W.2d at 908–09 (expounding that doctrine exists so fraudsters cannot employ statutes of limitation as devices for successfully defrauding those reasonably unaware of fraud).

## B. Analysis

### 1. Evidence of Actual Knowledge

Janice first argues that the appellees' fraud and unjust-enrichment claims are barred by the statute of limitations as a matter of law because she conclusively established that appellees had actual knowledge of the "wrongful act and their injury" by 2014 at the latest, but they did not sue until 2020.

Janice argues the appellees had actual knowledge of the injury-causing conduct no later than 2014, when purported payments from the Dewbre deal stopped. She relies on the fact that the purported payments from the Dewbre deal stopped, and the appellees knew this. She compares this case to the facts in *Exxon Corp. v. Emerald Oil & Gas Co.*, in which the Texas Supreme Court determined the statute of limitations had run because conclusive evidence established the plaintiffs "had actual knowledge of [the] alleged injury-causing conduct" years before they filed suit. *See* 348 S.W.3d at 206; *see also id.* at 203–04.

This case is distinguishable from *Emerald Oil* because there is no conclusive evidence establishing the appellees' actual knowledge of the *injury-causing conduct*—Larry's fraud. Indeed, there is no conclusive evidence of the injury itself—the misappropriation of the appellees' investments. In *Emerald Oil*, the plaintiffs sent letters and reports that without a doubt indicated they knew about the wrongful activity for which they would later sue—they asked the defendant to stop putting "junk" in their oil wells and plugging the wells, they knew at least some wells had been clogged, and they later sued the defendant for improperly plugging the wells. *Id.* at 203–07.

There is no such conclusive evidence in this case. The stopping of payments does not conclusively establish that the appellees had actual knowledge of Larry's injury-causing conduct—fraud. Though the appellees knew that purported payments

26

from the Dewbre deal stopped in 2014, they did not know the payments stopped because Larry had committed fraud, which was the injury-causing conduct for which they would later sue. *See Valdez*, 465 S.W.3d at 229 (stating that fraudulent concealment "tolls limitations until the fraud is discovered or could have been discovered with reasonable diligence"); *Hooks*, 457 S.W.3d at 58 n.9 (observing that even though fraudulent concealment may apply to causes of action other than fraud, fraudulent concealment only "tolls the running of limitations until the fraud is discovered or could have been discovered with reasonable diligence" in all cases).

When the appellees eventually filed suit, their causes of action—fraud and unjust enrichment—were based on the fact that Larry never closed the Dewbre deal and concealed that from them for years, not because he stopped making payments from the Dewbre deal. Thus, their knowledge that the payments stopped does not establish, conclusively or otherwise, that they knew of the injury-causing conduct for which they would later sue—Larry's fraud or the misappropriation of their investments. Rather, the record contains evidence that in the ten years between Fauth's and Cooper's initial investments with Larry and their lawsuit, they believed they were friends with him and that he was helping them grow their retirement savings—a belief that Larry fostered, for example, by representing that they were both partners in his businesses and by presenting them with additional investment opportunities into which the three of them could invest their money. As the trial

court found, based on the record, the purpose of these presentations was to prevent Fauth and Cooper from discovering Larry had misappropriated their money.

Further, the record contains evidence that the payments themselves were fraudulent. The payments were simply a tool Larry used to conceal the fact that the Dewbre deal never closed. The fraudulent payments that the appellees believed to be payments from the Dewbre deal cannot serve as evidence of their actual knowledge of Larry's fraud, or even as evidence of the injury caused by that fraud, specifically, the misappropriation of the appellees' investments.

Janice argues the stopping of payments should have raised a red flag for the appellees that something was wrong, but any red flags that might have been raised by the stopping of payments were concealed by Larry's fraud. Larry represented to the appellees that the payments stopped because the oil and gas market was down and the sale price of natural gas was low, which was cutting into their revenue, so the proceeds Fauth and Cooper would have received were being used to pay off their monthly note on the Dewbre deal, which they believed was a deal to purchase a $52 million asset. Fauth testified he believed their investment was "still solid" at that point, because the deal was producing enough money to pay off the monthly note, which unbeknownst to him did not even exist, and any money left over was being placed in an escrow account.[1] The trial court was entitled to credit the testimony that

---

[1] Fauth explained he was not alarmed when the payments stopped:

28

Fauth and Cooper would not discover that there was no Dewbre deal, no proceeds, no monthly note, and no escrow account until many years after 2014, particularly given that Larry facilitated these erroneous beliefs by sending them fictional income statements beforehand that purported to show the deal was consummated.

Moreover, as we have noted, the appellees presented evidence that Larry continued to assure the appellees their investment in the Dewbre deal was sound for years after the payments stopped by presenting them with new investment opportunities. He led the appellees to believe the Dewbre deal was successful because the money they were earning from it could be used to pursue these new opportunities. These new opportunities, Fauth testified, were a "continuation of [their] business dealings" with Larry. Fauth believed the Dewbre deal provided the "seed money" so they could "continue[] to have business opportunities that were generated from that investment." In presenting these new opportunities to the appellees, Larry could only have intended to mislead them, given that he knew that there was no Dewbre deal or profits to be invested in any additional ventures.

---

[M]y investment was still solid because we were making enough production to pay the monthly note. We just—and whatever we did have left over, it was being placed into an escrow account, so I was told. . . . The reason I didn't do anything at that point is because [as] I understood the situation, our investment was still good. And we had already been paying, to my knowledge, on a 52-million-dollar asset and we were getting close—closer to paying it off and starting all over.

29

Far from yielding conclusive proof that appellees were aware of Larry's fraud in 2014, the record contains evidence that Larry prevented the appellees from learning the truth with yet more fraud: he took the appellees' money purportedly for the Dewbre deal but never closed the Dewbre deal; he never told the appellees that the deal failed but sent them fabricated checks accompanied by equally fabricated income statements to conceal the deal's failure, and when he could no longer afford to do that, he told them the payments stopped because of fluctuations in the oil and gas market but presented them with other opportunities in which they could invest their proceeds from the Dewbre deal. The stopping of the payments, which was covered up with more fraud, is one link in a chain of fraudulent acts and does not establish the appellees had actual knowledge of Larry's wrongful conduct.

Janice further argues that she conclusively proved that, even if appellees were not aware of the wrongful conduct, they had actual knowledge of their injuries back in 2011—when Citadel breached its contracts with the appellees by not repaying their $620,000 in loans within 59 days. Given the facts, we disagree.

At the outset, we note that the trial court found that the contracts were part of Larry's scheme to defraud the appellees, a finding that Janice does not contest on appeal. The trial court concluded that the contracts were void. This conclusion is erroneous. Contracts procured through fraud are voidable rather than void. *Willacy Cty. Appraisal Dist. v. Sebastian Cotton & Grain*, 555 S.W.3d 29, 52 (Tex. 2018).

30

But this distinction is of no moment here. The critical point is that the contracts themselves were tainted, being no more than one step in Larry's ongoing fraud.

The appellees' claims are not for breach of contract, and their injury is not Larry's failure to honor the contracts' payment terms. The injury in this case is the loss—resulting from Larry's fraud—of the appellees' *investment capital*—an injury that was obscured when Larry misrepresented that he had put their capital toward ventures with potential for future profit.

When Citadel failed to repay the $620,000 in loans by May 2011 as contemplated in the fraudulently procured contracts, Fauth and Cooper still believed the Dewbre deal had closed or was about to close. Fauth testified that he did not take any action against Larry then because "the Dewbre deal was so good, at that point I was willing to maintain my six-percent ownership in that deal." While he knew he had not timely been repaid, he also believed that he was going to receive huge returns from the Dewbre deal. Essentially, Larry enticed the appellees not to sue by promising a much bigger payout in the future. Around that same time, also in May 2011, Larry invited Fauth and Cooper and their wives to a celebratory dinner in Corpus Christi, which was "a celebration that . . . the Dewbre deal had closed and— or was in the process of getting ready to close and things were going our way," as Fauth described it. There is no direct evidence that the appellees had any knowledge at that time that their $620,000 investment was gone, stolen through fraud. Rather

than alerting the appellees to injury, Larry's representations led them to believe their investment was *still invested* and doing well and they were going to receive huge returns.

Janice nevertheless argues that the Texas Supreme Court's recent decision in *Marcus & Millichap Real Estate Investment Services of Nevada v. Triex Texas Holdings* compels reversal. *See* 659 S.W.3d at 460 (holding that where it was "undisputed" that plaintiff had actual knowledge of its injury, discovery rule did not defer accrual of plaintiff's cause of action until it knew that defendant caused its injury). We disagree. *Marcus & Millichap* is inapposite for three reasons. First and most significantly, in *Marcus & Millichap*, it was "undisputed" that the plaintiff "knew it was injured in December 2012"—a date that rendered its February 2017 attempt to sue an additional defendant beyond the four-year limitations period. *Id.* The remainder of the Texas Supreme Court's reasoning in *Marcus & Millichap* flows from the uncontested knowledge of injury. This active knowledge triggered the necessity for the plaintiff to conduct a diligent inquiry. *Id.* at 462. Here, appellees vigorously disputed having known that their money had been stolen—as opposed to invested—in either 2011 or 2014. Indeed, the trial court made specific findings supported by ample evidence that Larry's unabated decade-long string of false representations prevented the appellees from learning about their actual injury until 2020 following his death.

Second, *Marcus & Millichap* involved the application of the discovery rule, rather than the doctrine of fraudulent concealment, which the plaintiff did not plead. *Id.* at 463. Here, in contrast, the appellees pleaded fraudulent concealment and obtained factual findings in their favor on the question. Though the Court in *Marcus & Millichap* observed in dicta that fraudulent concealment would not have saved the claim at issue even if it had been pleaded as a counter-defense to limitations, its observation in that case was once again grounded in the case-specific circumstance that it was undisputed the plaintiff knew of the very injury at the heart of its suit in December 2012—a date that made its attempt to add another defendant to the suit more than four years later fall outside of the limitations period. *See id.* at 462–64.

Finally, in *Marcus & Millichap*, the Court found that the plaintiff's undisputed knowledge of a breached lease started the running of the statute of limitations on the plaintiff's claim against its broker for overvaluing the property to inflate its commission on the sale of the property by a third party to the plaintiff. *Id.* at 460. The question before the Court was "whether the discovery rule defer[red] accrual of [the plaintiff's] cause of action until it knew that [its broker] caused its injury," rather than or in addition to the party the plaintiff first sued for breach of contract. *Id.* In other words, *Marcus & Millichap* ultimately turned on whether a plaintiff that knows of its injury can wait until after limitations to investigate who is responsible for that known injury. *See id.* Consistent with longstanding Texas law, the Court answered

33

in the negative. *See id.* at 462 (citing prior decisions for proposition that reasonable diligence is required once party knows of its injury and that discovery rule does not defer accrual until party knows precise nature of each wrongful act that may have caused injury or exact identity of all wrongdoers who may be responsible). Because Fauth and Cooper did not know of their injury within the limitations period, the Court's decision reiterating that once one knows of his injury, he must diligently investigate who may have caused it and how has no application in this instance.

The dissent argues the Citadel contracts are indispensable to our analysis here and analyzes the specific terms of the contracts, asserting that whether the contracts are valid has nothing to do with whether their terms would have caused a reasonably prudent person to make inquiry. We disagree. Whether the contracts were themselves no more than a step in Larry's fraudulent scheme affects our analysis because the appellees are entitled to disavow the terms of a fraudulently procured contract upon learning of the fraud. *See Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 405 (Tex. 2016) (stating that contract procured through fraud may be affirmed or rejected at election of defrauded party). Any doubts the appellees may have had about whether they suffered some injury when Larry failed to make the contractually required payments were quickly assuaged by Larry's fraudulent assurances and, within a few months, by fraudulent payments that seemed to confirm they had made a solid investment. And when these payments stopped, the appellees diligently

inquired only to be reassured by Larry that nonpayment resulted solely from the oil and gas market being down, another misrepresentation in a long train of intentional fraud. For these reasons, Larry's breach of contract is inapposite.

The dissent also argues that we have conflated knowledge of an injury with knowledge of a theory of recovery because we distinguish between the claims for which the appellees actually sued and those for which they did not. The dissent argues the appellees did not need to know of Larry's *fraud* to know they had been injured because the fraudulently procured contracts were breached. But the appellees' knowledge of Larry's fraud, or facts from which they reasonably could have uncovered his fraud, are dispositive in determining when fraudulent concealment ceases to toll limitations. *See Valdez*, 465 S.W.3d at 229 (declaring fraudulent concealment "is a fact-specific equitable doctrine that tolls limitations until the fraud is discovered or could have been discovered with reasonable diligence"). Larry's failure to comply with the terms of these contracts does not establish the appellees' actual knowledge of the injury-causing conduct in this case, which is fraud, or the resulting injury, which is the misappropriation of their investment capital. The appellees did not know they had lost their investment capital until after Larry's death in 2020; thus, they did not know of the injury for which they would later sue until at least 2020. Under the circumstances, as explained by Fauth and Cooper in their trial testimony about the potential profits, Larry's reassurances,

and the state of the oil and gas market, the appellees had reasonable grounds to forego pursuit of contractual remedies they were entitled to pursue when Larry missed the initial 59-day deadline for payment in 2011 and later halted making payments altogether in 2014.

In *KPMG Peat Marwick v. Harrison County Housing Finance Corp.*, on which the dissent relies, the plaintiff in the case conclusively had actual knowledge of the specific injury for which it would later sue though it did not know the extent of the defendant's involvement. 988 S.W.2d 746, 749–50 (Tex. 1999). In this respect, *KPMG* is essentially like *Marcus & Millichap*. In both cases, the plaintiff actually knew of the injury for which it sued within the limitations period, and the Court rejected the position that the plaintiff's failure to contemporaneously know the nature of each wrongful act that may have caused the injury deferred accrual. 659 S.W.3d at 462; 988 S.W.2d at 749–50. In contrast, the appellees did not actually know that Larry had misappropriated their investment capital because he fraudulently concealed his misappropriation from them, and the trial court, sitting as factfinder, found their reliance on his fraudulent representations was reasonable under the circumstances of this case, as was the trial court's prerogative. *See Hooks*, 457 S.W.3d at 58 n.7 (citing prior decisions standing for proposition that whether plaintiff knew or should have known of fraud, including whether he exercised reasonable diligence, are ordinarily facts issues for factfinder to decide); *see also*

36

*Mercedes-Benz USA v. Carduco, Inc.*, 583 S.W.3d 553, 558 (Tex. 2019) (stating whether party's actual reliance on fraud is justifiable is usually question of fact, excepting when circumstances show reliance is not justifiable as matter of law).

Finally, Janice resorts to the policy reasons behind statutes of limitations: to prevent litigation of "stale claims" where the "search for truth" is "impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents[,] or otherwise." *Kerlin*, 263 S.W.3d at 925. While true, there are also policy reasons for allowing fraud to defer accrual of a cause of action:

> Texas courts have long adhered to the view that fraud vitiates whatever it touches, and have consistently held that a party will not be permitted to avail himself of the protection of a limitations statute when by his own fraud he has prevented the other party from seeking redress within the period of limitations. To reward a wrongdoer for his own fraudulent contrivance would make the statute a means of encouraging rather than preventing fraud.

*Borderlon*, 661 S.W.2d at 908–09.

\* \* \*

The evidence does not conclusively establish the appellees had actual knowledge of the wrongful conduct or injury in 2011, when Citadel failed to repay its loan, or in 2014, when Larry stopped sending payments. *See Dow Chem. Co.*, 46 S.W.3d at 241 (explaining that party raising legal sufficiency challenge must conclusively establish all vital facts in support of issue). We overrule Janice's first issue.

## 2. Evidence of Fraudulent Concealment

Janice next argues that the trial court erred in tolling limitations as to the appellees' claims based on Larry's fraudulent concealment because the evidence conclusively disproves that fraudulent concealment applied to the appellees' claims.

### a. Larry's Concealment of Fraud

First, Janice argues the evidence conclusively disproves the trial court's finding that Larry concealed fraud and prevented the appellees from learning the Dewbre deal never closed. She argues this is because the evidence conclusively proves the appellees had actual knowledge, or with reasonable diligence could have known, that Larry was committing fraud no later than 2014, when the purported payments from the Dewbre deal stopped.

As for actual knowledge, we have already held that the appellees did not have actual knowledge of fraud in 2014 when the payments stopped because Larry concealed the reason for the payments stopping with more fraud. Specifically, he told them the purported payments from the Dewbre deal stopped because of fluctuations in the oil and gas market, not because the Dewbre deal never closed.

As for reasonable diligence, contrary to Janice's assertion, the evidence does not conclusively establish that the appellees could have discovered Larry's wrongdoing through the exercise of reasonable diligence—a question that ordinarily must be resolved by the factfinder as an issue of fact. *E.g.*, *Hooks*, 457 S.W.3d at 58

38

n7. Unlike the atypical cases in which reasonable diligence can be determined as a matter of law, here, the record does not contain any "readily accessible and publicly available" information that would have uncovered the wrong. *See Hooks*, 457 S.W.3d at 59 (quoting *Ross*, 356 S.W.3d at 929) (publicly available information can establish as matter of law that reasonable diligence would uncover wrongful act); *see also Marshall*, 342 S.W.3d at 69 (two specific publicly available documents filed with Railroad Commission would have uncovered fraud); *Kerlin*, 263 S.W.3d at 926 (certain land title records and court records relating to disputed land were publicly available and could have been discovered through reasonable diligence).

Janice has failed to identify in the record any public information that would have uncovered Larry's fraud—the appellees' investment in Citadel was a private transaction between friends and not the subject of public records, unlike oil and gas operations or land title proceedings. And the nonpublic records Larry provided to the appellees—fabricated income statements accompanying payments for bogus returns—were intended to induce a false sense of security and thereby prevent inquiry. Further, appellees presented significant evidence that Larry was secretive in his operations. Indeed, even his wife did not know the details of his business dealings, and with the appellees, he repeatedly emphasized the need for secrecy. As the trial court found, Larry stressed the importance of secrecy and confidentiality precisely to persuade the appellees not to investigate their business dealings.

39

Furthermore, unlike the claimants in cases where reasonable diligence as a matter of law requires "sophisticated [oil and gas] lessors to acquaint themselves with 'readily accessible and publicly available information' from Railroad Commission records," Fauth and Cooper were not sophisticated oil and gas investors who understood the oil and gas industry. *See Hooks*, 457 S.W.3d at 57 (quoting *Ross*, 356 S.W.3d at 929). Neither appellee in this case claimed to have any prior experience investing in, or any understanding of, the oil and gas industry.

In sum, because this is not the type of case in which reasonable diligence can be determined as a matter of law, whether reasonable diligence would have uncovered Larry's fraud is a question of fact. *See id.* at 61 (concluding fraudulent Railroad Commission filings could not establish lack of reasonable diligence as matter of law, so reasonable diligence was fact question). Here, the factfinder determined the appellees acted reasonably in light of all the circumstances and reasonable diligence would not have uncovered the fraud.

Finally, contrary to Janice's claim that the evidence conclusively disproves that Larry concealed fraud, there is overwhelming evidence to support that finding. Larry invited the appellees and their wives to Corpus Christi for a celebratory dinner because the Dewbre deal was closing. He mailed the appellees checks with income statements identifying production costs and expenses, to make the appellees believe they were receiving returns from their investment in the Dewbre deal. When he could

40

no longer keep making payments, he told the appellees that oil and gas prices were down, but he was keeping what was left of their returns in escrow, and he kept presenting them with new investment opportunities in which they could invest their Dewbre returns to lead them to believe their investment was doing well and to string them along for years.

The evidence does not conclusively prove the appellees knew or with reasonable diligence could have discovered Larry's fraud in 2014. And, contrary to Janice's claim, there is overwhelming evidence to support the trial court's finding that Larry concealed fraud to prevent the appellees from learning the Dewbre deal never closed.

### b. Red Flags

Janice next argues the evidence conclusively proves the appellees saw red flags but chose to ignore them and deliberately made no inquiry for years on end, which shows a lack of reasonable diligence. She argues the appellees chose not to sue in 2011 after their $620,000 in loans was not repaid, they never hired a lawyer or CPA to look into their investment, they never contacted Jerry Dewbre, Robert Painter, or Donald Wiese about their investment, and they never contacted the Railroad Commission to determine if the oil and gas interests in connection with the Dewbre deal were active. But the only potential red flag she identifies here is Larry's failure to repay their loans—the rest of her argument is based on additional steps the

41

appellees could have taken, which she claims they should have taken in the exercise of reasonable diligence. We disagree that failing to take any of these additional steps conclusively proves a lack of reasonable diligence because the appellees were not on notice that they needed to further investigate.

If failure to repay the loans was a red flag as to Larry's fraud, Larry concealed that fact by assuring the appellees the Dewbre deal had closed and by sending them payments to make them believe the deal was successful. At that point, because of Larry's fraudulent promises, the appellees believed the Dewbre deal was good and that they would be receiving repayment of their loans and much more in the future. The appellees' decision not to sue at that point is not conclusive proof of a lack of reasonable diligence when the potential red flag was covered up with more fraud—Larry's assurances that the deal had closed, a celebratory dinner to commemorate the deal closing, and, within a few months, payments, accompanied by fabricated income statements, purportedly from the proceeds of the deal.

Concealing the only potential red flag with fraud makes the additional steps Janice cites unnecessary. She argues the appellees could have exercised reasonable diligence by hiring outside consultants or asking others about the deal, but, because of Larry's false assurances, the appellees had no reason to question the status of the deal. After all, a duty to investigate only emerges when a reasonable person would have cause to suspect something is amiss. *See Valdez*, 465 S.W.3d at 229–30

42

(indicating estoppel effect of fraudulent concealment ceases when party gains actual knowledge of fraud or circumstances that would prompt reasonably prudent person to make inquiry that, if pursued, would uncover fraud). Whether the additional steps Janice advocates were necessary in the exercise of reasonable diligence was a question for the factfinder, and the factfinder determined they were not. *See Hooks*, 457 S.W.3d at 57–61 (reasonable diligence is fact question when fraudulent records cannot establish lack of reasonable diligence as matter of law).

Janice argues that if the appellees had hired an outside consultant, they could have discovered the fraud. She points out that neither Fauth nor Cooper ever hired a lawyer, CPA, or oil and gas consultant to look into their investment. Both Fauth and Cooper openly admitted they did not do so when they could have. But as Fauth explained when asked if there was anything preventing him from contacting someone to determine the status of the Dewbre deal, "there was no need." Larry assured them that the deal had closed and their investment was sound, and they were purportedly receiving returns from the deal for a few years. Failing to hire an outside consultant to investigate the status of a deal that, due to Larry's fraud, appeared to be doing well, is not conclusive proof of the lack of reasonable diligence. Regardless, the test for fraudulent concealment tolling is not simply whether the plaintiffs exercised reasonable diligence. It is whether such reasonable diligence would have uncovered the fraud. *E.g.*, *Valdez*, 465 S.W.3d at 230. Janice did not prove, by either

43

conclusive or even strong evidence, that hiring a consultant of one form or another would have revealed the fraud.

In the same vein, the dissent argues that the appellees could have inspected Citadel's business records because they held membership interests in Citadel. *See* TEX. BUS. ORGS. CODE § 101.109(a)(3), (4). But even though they could have, due to Larry's fraud, they had no reason to think they needed to further investigate.

The same reasoning applies to Janice's argument that neither Fauth nor Cooper ever contacted Jerry Dewbre, Robert Painter, or Donald Wiese about the Dewbre deal. Larry's fraud led Fauth and Cooper to believe the deal was going well, and there was no need to contact outsiders. Though the appellees admitted they could have contacted Jerry Dewbre, there is no evidence that they knew him personally. In any event, they did not invest with Jerry Dewbre personally; they invested in Larry's company which then purportedly invested in Dewbre's company. The appellees would have had no reason to personally contact the owner of a company with which they had no personal connection when they believed their investment was doing well. There is also no evidence that Robert Painter and Donald Wiese, two of Larry's business associates, were even involved in the Dewbre deal, so the appellees' failure to contact them about an investment that seemed to be doing well is not conclusive proof of the appellees' lack of reasonable diligence.

Janice also argues the appellees should have contacted the Railroad Commission, but she does not identify what information the Commission would have provided that would have uncovered the fraud. Dewbre Production was an active oil and gas production company and would have filed records with the Commission, and the appellees *believed* they had been receiving profits from Dewbre Production.

We note again that the appellees' investment in Citadel was a private deal between friends; Janice has not identified any public records detailing Citadel's financial dealings, and Larry himself was the appellees' only source of information regarding the deal. But Larry was also the source of the fraud. *See Hooks*, 457 S.W.3d at 61 (concluding as matter of law no lack of reasonable diligence when source of information—public records—tainted by fraud). Janice's suggestion that the appellees could have contacted Larry to uncover the status of the Dewbre deal is not reasonable, given that Larry committed the fraudulent acts that kept the appellees from discovering the truth about the Dewbre deal.

Larry's fraudulent concealment also distinguishes this case from *HECI Exploration Co. v. Neel*, in which the Texas Supreme Court stated that "[r]oyalty owners cannot be oblivious" to certain facts, 982 S.W.2d 881, 886 (Tex. 1998), "make[] no inquiry for years on end[,] . . . then sue for breaches of contract that could have been discovered within the limitations period if reasonable diligence had

been exercised," *id.* at 887–88. In that case, oil and gas royalty owners sued their lessee for failing to notify them that a neighboring, competitor lessee was overproducing oil from a common reservoir. *Id.* at 884. The claim was time-barred, but the royalty owners asserted that the discovery rule forestalled the application of limitations. *Id.* at 884–85. The Court concluded the claim was not undiscoverable. *Id.* at 886. Though the Court observed that it decides "whether the discovery rule applies to particular types of cases rather than to a particular case," it also noted that the royalty owners' lessee, their main source of information, was always forthcoming with information when asked. *Id.* at 886. Had the lessees simply asked for more information, they could have discovered the truth. *See id.* The Court acknowledged that if someone had fraudulently concealed information from the royalty owners, as Larry did here, then limitations could be tolled. *See id.* ("Of course, if an operator fraudulently concealed information from a lessee, decisions of this and other courts indicate that limitations may be tolled.").

Furthermore, as in other cases in which a sophisticated oil and gas royalty owner was found not to have exercised reasonable diligence as a matter of law, the Court noted that records about operations that would have revealed the wrongdoing in that case are "generally available" from the Railroad Commission. *Id.* But the Court stopped short of holding that all Railroad Commission records constitute constructive notice of their content, *id.*, instead stating only "some records of the

46

Railroad Commission in some circumstances may provide constructive notice," *id.* at 887. Records from the Railroad Commission "are a ready source of information," so the accrual of a claim based on the failure to provide that information—the claim in that case—is not deferred by the discovery rule. *Id.* Here, the appellees' claims are not based on Larry's failure to provide publicly available information, but for theft of their money and fraudulently concealing the theft for years.

As such, Janice has not conclusively established that the appellees were not reasonably diligent, or that such reasonable diligence would have uncovered the fraud. *See Hooks*, 457 S.W.3d at 59 (reasonable diligence can be determined as matter of law when readily accessible and publicly available information would uncover fraud). Janice has not identified any information in the public record that would have uncovered Larry's fraud. And, when, as here, reasonable diligence cannot be decided as a matter of law, it is for the factfinder to determine whether the appellees acted with reasonable diligence and whether reasonable diligence would have uncovered the fraud. *Id.* at 61. Here, the trial court properly found that the action they took was reasonable and reasonable diligence would not have uncovered Larry's fraud because he concealed it and actively misled them for years.

### c. Reliance on Larry's Representations

Next, Janice argues that the appellees were not reasonably diligent in relying on Larry's representations alone. Citing *BP America Production Co. v. Marshall*,

she argues that "reasonable diligence obliges owners of property interests to make themselves aware of pertinent information available in the public record." *See* 342 S.W.3d at 67. Once again, Janice has not identified documents in the public record that would have uncovered Larry's fraud, so she cannot establish conclusively that the appellees were not reasonably diligent for failing to consider documents in the public record. *See Hooks*, 457 S.W.3d at 59 (reasonable diligence can be determined as matter of law when readily accessible and publicly available information would uncover fraud). And conduct that Fauth and Cooper could have engaged in that would not have uncovered Larry's fraud is immaterial to their diligence. *See Valdez*, 465 S.W.3d at 229 (stating fraudulent concealment "tolls limitations until the fraud is discovered or could have been discovered with reasonable diligence").

In *Marshall*, another case in which oil and gas mineral owners sued their lessee for fraud, a member of the owning family "testified that he was a sophisticated lessor who subscribed to industry publications, worked as a driller when he was younger, and thus understood the oil and gas industry." 342 S.W.3d at 69. The Texas Supreme Court held, as a matter of law, he would have been able to uncover the lessee's fraud by comparing its well log with its plugging report, both documents that were filed with the Railroad Commission, because when read together, these publicly available documents would have led him to discover the lessee was not producing oil, contrary to its representations. *Id.* at 68–69.

48

Unlike *Marshall*, the record here does not disclose any publicly available documents that would have led the appellees to discover Larry's fraud. Again, the appellees' investment in Citadel was a private deal among friends, and Citadel never actually invested in Dewbre Production, so there were no public records relating to the deal. Cases holding sophisticated oil and gas lessors were not reasonably diligent in failing to utilize publicly available documents are inapposite. *See, e.g.*, *Ross*, 356 S.W.3d at 929 (plaintiffs could have discovered fraud through reasonable diligence by studying public price indexes or General Land Office records); *Marshall*, 342 S.W.3d at 69 (plaintiffs could have discovered fraud through reasonable diligence by comparing public Railroad Commission documents).

Finally, we disagree with Janice's contention that the appellees relied on Larry's representations alone. They received checks from Larry's company, EPD, along with income statements that appeared to be returns from their investment in the Dewbre deal. The appellees presented evidence, beyond Larry's representations alone, that led them to reasonably believe the Dewbre deal had closed, and their investment was doing well.

When the payments stopped in 2014, the appellees relied on Larry's representations that the oil and gas market was down so any leftover money they had after paying off the monthly note was being held in escrow for future investments. But at that point, the appellees already had good reason to believe that the Dewbre

deal had closed, and their investment was doing well enough not to question it. The trial court was entitled to credit this evidence, which hinges on the appellees' credibility. *See Wilson*, 168 S.W.3d at 819 (noting that in legal-sufficiency review factfinder is sole judge of credibility of witnesses and weight of their testimony); *Golden Eagle Archery*, 116 S.W.3d at 761 (noting that in factual-sufficiency review that factfinder is sole judge of credibility of witnesses and weight of their testimony).

Janice emphasizes that the appellees admitted they could produce no document, no check, no receipt specifically stating they owned an interest in the Dewbre deal; they could only refer to their understanding from Larry that they had invested in Citadel, Larry's company, which then invested in the Dewbre deal. Rather than highlight any kind of unreasonableness on the appellees' part, we view this as only highlighting the extent of Larry's fraud, or so the trial court could have reasonably found based on the evidence, especially in light of the evidence that Larry sent the appellees checks that were purportedly their returns from the Dewbre deal to keep them from finding out the Dewbre deal never closed.

It is also significant that the appellees themselves never personally invested in Dewbre Production or claimed an ownership interest in it; they invested in Larry's company which then purportedly invested in Dewbre Production, and so Larry alone would have been in possession of any documents identifying his company's interest in Dewbre Production—if it had one. This speaks to the intricacy of Larry's fraud

50

and the lengths he went to ensure the appellees did not learn the truth. Or so the trial court, sitting as factfinder, could have reasonably inferred from these circumstances. *See Earle*, 998 S.W.2d at 888 (stating that finding of fraudulent concealment may rest on circumstantial evidence); *Eberle v. Adams*, 73 S.W.3d 322, 329 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (observing that when circumstantial evidence allows more than one reasonable inference, factfinder is the one who decides which one to credit, subject only to review for factual sufficiency by court of appeals).

Finally, Janice asserts again that the appellees did not pursue legal action "when they knew they had suffered injuries" from the stopped payments of the purported Dewbre returns and the failure to repay the $620,000 in loans, but we disagree that the appellees knew they were injured after either of those instances because Larry's fraud prevented them from learning the truth, as we have already discussed.

Janice's argument that the appellees were not reasonably diligent in relying on Larry's representations alone is unavailing because they did not rely on his representations alone. Instead, they received actual checks and income statements that appeared to be returns on their investment. This does not conclusively establish that they were not reasonably diligent.

51

#### d. Typed Calculations

Janice next argues that the typed calculations in the income statements Larry sent to the appellees along with their checks purportedly from the Dewbre deal conclusively establish there was no fraudulent concealment because the appellees could not have reasonably relied on these statements as evidence of the Dewbre deal.

For a period of about three years, Larry sent the appellees checks along with "income statements" bearing calculations showing income per person after deductions for expenses:

January Income Statement

Income
$1,096,580.81 x 80% = $877,264.64

Expenses
LOE= $38,971.01 x 80% = $31,176.81
Taxes = $82,243.56 x 80% = $65,794.85
Note = $41,800,000.00 (Divide by) 60 mos. = $696,666.66

Total Deductions = $793,638.32

Net Income
$83,626.32 x 12% = 10,035.16

Income per person = $5,017.58

March Income Statement

Income
$1,003,675.11 x 80% = $802,940.08

Expenses
LOE= $38,116.69 x 80% = $30,493.35
Taxes = $75,275.63 x 80% = $60,220.50
Note = $41,800,000.00 (Divide by) 60 mos. = $696,666.66

Total Deductions = $793,638.32

Net Income
$15,559.57 x 12% = 1,867.14

Income per person = $933.57

Janice argues the appellees' reliance on these checks and income statements as evidence of the Dewbre deal was not reasonable because they do not mention the Dewbre deal or resemble legitimate financial statements. First, we again note that these checks and statements are not "readily accessible and publicly available" information that would have uncovered the wrong, and Janice has not cited any public records that would have revealed these checks were fraudulent, so this is not a case in which reasonable diligence can be determined as a matter of law. *See*

*Hooks*, 457 S.W.3d at 59 (quoting *Ross*, 356 S.W.3d at 929). Whether the appellees were reasonably diligent in relying on these checks and statements as evidence of the Dewbre deal is a question of fact for the factfinder, *see id.* at 61, and here, the factfinder determined that they were.

The checks and statements are consistent with a return on the investment the appellees believed they made, even though they do not reference Dewbre Production specifically. The appellees invested in Larry's company, EPD, which then rolled over into Citadel. Citadel, they believed, entered into an agreement with Dewbre Production to purchase, with monthly payments over 60 months, several oil wells that were already producing oil. The checks are from Larry's company, EPD, and signed by Larry. The statements reference a 60-month note, income, taxes, and LOE—meaning a "list of expenses," which were expenses taken out of the gross profits for things like "cleaning out a well, repairing a well or things that make the well produce," as Fauth testified. Thus, the checks and statements appear to be part of the Dewbre deal. The fact that the statements do not resemble legitimate financial statements, even if true, speaks to the level of the appellees' sophistication as investors and does not conclusively prove the appellees were not reasonably diligent in relying on them.

Rather than serve as evidence of a lack of reasonable diligence as Janice argues, the checks and income statements provide strong evidence of Larry's efforts

to fraudulently conceal that the Dewbre deal never closed. As there was no deal and no income or expenses, it is evident that these numbers detailing income and expenses are entirely fabricated. Thus, we disagree that the checks and income statements conclusively prove there was no fraudulent concealment.

### e. Larry's Emails

Next, Janice argues that the trial court relied on Larry's emails as evidence of fraudulent concealment, but she argues the trial court erred because the emails conclusively prove there was no fraudulent concealment.

Over the course of their ten-year friendship, Larry sent the appellees numerous emails about potential investment opportunities. Janice correctly notes that these emails, at least some of which were introduced into evidence, do not reference the appellees' investment or a specific connection to the Dewbre deal, and the appellees agreed that Larry never represented that any of these potential deals closed.

Standing alone, the emails do not conclusively prove or disprove fraud or fraudulent concealment. But when coupled with the appellees' testimony, the emails support their claim that Larry led them to believe their investment was doing well—and kept them from questioning the investment—by presenting new opportunities in which they could invest their Dewbre returns. Fauth testified that after the purported payments from the Dewbre deal stopped, Larry told him the investment was "still solid" because it was earning enough from production to pay the monthly note, but

whatever money was left over was being placed in an escrow account. This money, Fauth testified, was the "seed money" for Larry and the appellees to "continue[] to have business opportunities that were generated from that investment." These new opportunities were a "continuation of [their] business dealings" with Larry.

The emails provide some evidence of Larry's fraud; they do not conclusively disprove fraudulent concealment.

### f. No Partnership

Janice argues that the trial court rejected a finding that the appellees and Larry formed a partnership. She notes that the trial court purposely struck out references to partners and partnerships in its original findings of fact. Yet the trial court's amended findings of fact include a finding that Larry "represented to [the appellees] that they were partners in [Larry's] businesses and presented [the appellees] with a series of investment opportunities." Even assuming the trial court intended to reject a partnership finding, the lack of a legal partnership does not conclusively establish Larry did not fraudulently conceal information or continue to commit fraud over the course of years.

\* \* \*

The evidence does not conclusively disprove that fraudulent concealment applies to the appellees' claims, as Janice argues, but there is ample evidence to support the trial court's conclusion that fraudulent concealment tolled the statute of

limitations. *Cf. Wilson*, 168 S.W.3d at 810 (court will sustain no-evidence challenge if there is complete absence of evidence of vital fact or if evidence conclusively establishes opposite of vital fact). We find no error in the trial court's conclusion.

### 3. Continuing-Tort Doctrine

Lastly, Janice argues that the evidence conclusively negates the application of the continuing-tort doctrine because the appellees knew or through reasonable inquiry had the ability to know the status of their investments. The trial court concluded that the continuing-tort doctrine applied as an additional means by which to make the lawsuit timely.

Because we have already held that there was no error in the trial court's conclusion that the doctrine of fraudulent concealment tolled the running of the statute of limitations, we need not reach the issue of the continuing-tort doctrine's application. *See* TEX. R. APP. P. 47.1 (appellate court's written opinion need not address issues unnecessary to final disposition of appeal). The dissent, however, cannot justify reversal without examining why the trial court's findings of fact and conclusions of law supporting the doctrine's application are erroneous.

We therefore overrule Janice's second issue.

## II. Evidence of Justifiable Reliance, Damages, and Unjust Enrichment

In her third issue, Janice claims there is no evidence to support the trial court's findings of justifiable reliance, damages, or unjust enrichment.

56

## A. Justifiable Reliance

### 1. Applicable Law

Justifiable reliance is an element of a fraud claim. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018). To establish justifiable reliance, a plaintiff must show that he actually relied on the defendant's false representations and that his reliance was justifiable. *Id.* Janice disputes that the appellees' reliance on Larry's representations was justifiable.

Ordinarily, justifiable reliance is a question of fact, but under some circumstances, a court may determine as a matter of law that reliance is not justifiable. *Id.* at 654. In making this determination, we view the entirety of the circumstances "while accounting for the parties' relative levels of sophistication." *Id.* at 656. In an arm's-length transaction, each party must exercise reasonable diligence to protect his own interests; a party may not justifiably rely on "mere confidence in the honesty and integrity of the other party." *Id.* at 654 (quoting *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015) (per curiam)).

A party may not justifiably rely on an oral representation that is directly contradicted by a written contract. *Id.* at 658.

A party also may not rely on another's representation when there are "red flags" indicating further investigation is needed. *Id.* at 655. A party cannot "blindly rely" on a defendant's representation when the party's "knowledge, experience, and

background warrant investigation into any representation[]" before relying on it. *Id.* at 654 (quoting *Shafipour v. Rischon Dev. Corp.*, No. 11-13-00212-CV, 2015 WL 3454219, at *8 (Tex. App.—Eastland May 29, 2015, pet. denied) (mem. op.)). We take into consideration a party's "individual characteristics, abilities, and appreciation of facts and circumstances" at the time the representation is made. *Id.* at 656 (quoting *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)). "[W]orld-savvy participants entering into a complicated, multi-million-dollar transaction should be expected to recognize 'red flags' that the less experienced may overlook." *Id.*

### 2. Analysis

Janice argues that the appellees' fraud claim must fail because the appellees' reliance on Larry's representations was not justifiable as a matter of law.

The trial court identified two representations upon which the appellees justifiably relied:

> (1) Larry represented that the appellees' combined total investment of $1.46 million was for the purchase of certain oil and gas leases from Dewbre; and
>
> (2) Larry represented that Citadel purchased the Dewbre petroleum assets.

The trial court found numerous other fraudulent representations by Larry but specifically based its finding of fraud on these two representations.

58

Janice argues the appellees' reliance on these representations was not justifiable as a matter of law for several reasons. We consider each in turn.

*Contract Contradiction*

Janice argues that the appellees' reliance on Larry's representations is not justifiable as a matter of law because his representations directly contradict the Citadel contracts, citing *Barrow-Shaver Resources Co. v. Carrizo Oil & Gas, Inc*. *See* 590 S.W.3d 471, 500 (Tex. 2019) (sophisticated oil and gas company could not reasonably rely on oral representation contrary to written contract provision).

We disagree. The trial court's uncontested finding that the Citadel contracts were fraudulently procured distinguish this case from *Barrow-Shaver* and other cases holding reliance on an oral representation that contradicts a written contract is not justifiable as a matter of law. *See, e.g.*, *id.*; *Orca Assets*, 546 S.W.3d at 660; *Westergren*, 453 S.W.3d at 424. Those cases all involve *valid* contracts, negotiated in arms-length transactions between sophisticated companies. *See Barrow-Shaver*, 590 S.W.3d at 475; *Orca Assets*, 546 S.W.3d at 651; *Westergren*, 453 S.W.3d at 422. None of those cases involves a fraudulently induced contract or a businessman with experience in multimillion-dollar deals taking advantage of two unsophisticated investors.

Here, Janice has not challenged the trial court's finding that the Citadel contracts were fraudulently procured. Consequently, Janice has not established that

the appellees' reliance on Larry's representations was unjustifiable as a matter of law based on directly contradictory terms of a valid, written contract. *See Orca Assets*, 546 S.W.3d at 658. Instead, these facts demonstrate there is some evidence to support the trial court's finding that the appellees' reliance was justifiable: Larry represented that they were investing with his company that was going to invest in an oil and gas deal; the contracts they signed that they believed to be valid contemplated an oil and gas deal, and they began receiving checks from one of Larry's companies that appeared to be investment returns on the oil and gas deal.

## *Red Flags*

Janice next argues there were red flags that should have alerted the appellees their reliance was unjustifiable, and these red flags negate justifiable reliance as a matter of law. *See Barrow-Shaver*, 590 S.W.3d at 501 (noting there were red flags alerting plaintiff its reliance on oral representation was not justifiable, like direct contradiction between oral representation and unambiguous contract provision, plaintiff's sophistication and knowledge that oral representation had no bearing on contract's express language, plaintiff's extensive experience in oil and gas industry, and arm's-length negotiations that resulted in non-standard agreement); *see also Orca Assets*, 546 S.W.3d at 656–58 (discussing red flags that should have alerted plaintiff that tract it was about to lease had already been leased, like lessor's equivocal representations, landman's doubts that tracts of land were not already

60

leased, letter of intent with no assurances as to title of tracts, contract language never seen before in any lease by sophisticated oil and gas company, and plaintiff's willful decision to stop checking public title records before signing lease contract).

We first note that neither appellee was a sophisticated oil and gas investor, unlike the experienced companies involved in the cases on which Janice relies. *See Barrow-Shaver*, 590 S.W.3d at 484 ("The parties are sophisticated oil and gas entities that had representatives with extensive experience in the oil and gas industry."); *Orca Assets*, 546 S.W.3d at 656 (noting plaintiff was newly founded company but "its key players" were "sophisticated oil-and-gas businesspeople" and company was "sophisticated business entit[y], composed of knowledgeable, skilled, and experienced people"). Fauth worked as a forklift operator, then foreman, for Hughes Tool, which became Baker Hughes, and he later moved into the company's human resources department. He was never involved in the company's oil and gas operations and admitted that he has no experience with oil and gas investing. Cooper owns a commercial construction company and has no experience with oil and gas investing.

We have not found, nor has Janice identified, any red flags in the record indicating that reliance on Larry's first fraudulent statement, that the appellees' investment money was for the Dewbre deal, was unwarranted. In fact, there is some evidence that Larry tried to pursue the Dewbre deal. Jerry Dewbre's declaration

61

states that Citadel contracted with Dewbre Production in 2011 to purchase "certain oil and gas leases and other related lease hold interests," and that Citadel as part of the contract was to make a $1.25 million nonrefundable deposit as earnest money. Citadel paid on several occasions for extensions of time to obtain funding for the earnest-money deposit—these payments for extensions of time totaled $374,192.55. But the funding period eventually expired, and the earnest money was forfeited. The record does not indicate how much of this the appellees knew at the time.

Janice points out that the appellees are not named in the contract between Citadel and Dewbre or in the extension contracts. That does not raise a red flag indicating the appellees should have further investigated, however, because the appellees were not personally involved in the transactions; they invested in Citadel, which was in turn supposed to invest in Dewbre Production. Janice also points out that none of the contracts the appellees signed mentioned Dewbre, but again, this does not raise a red flag because the contracts were an acknowledgment of the appellees' investment in Larry's company, Citadel, which he told them would then invest in Dewbre Production.

There are also no red flags in the record indicating that reliance on Larry's second fraudulent statement, that Citadel purchased the Dewbre assets, was unwarranted. Janice points out that there never was a signed contract for the $52 million Dewbre deal. But again, the appellees were not personally involved in the

Dewbre deal; they invested in Citadel which was supposed to invest in Dewbre Production. As minority investors in Citadel, they are not reasonably expected to demand to see every business contract Citadel signed, particularly when the appellees had ample reason to believe the deal had closed: Larry told them the deal had closed, he invited them and their wives to a celebratory dinner to commemorate the deal closing, and they began receiving purported returns from the deal. Given their level of experience with investing, nothing about this raises a red flag indicating they should have investigated further. *See Orca Assets*, 546 S.W.3d at 654 (party cannot blindly rely on defendant's representation when that party's knowledge, experience, and background warrant investigation into representation).

Janice characterizes Larry's actions as a simple failure to procure financing and close the deal, which is not fraud, she argues, and the appellees could have learned the deal did not close through a simple phone call to Jerry Dewbre. While Larry's failure to close the deal may not constitute fraud, his representation that the deal closed when it had not *is* fraudulent. The appellees, who believed Larry's representation and had no red flags or other reason to question it, had no reason to call Jerry Dewbre—if they even knew him—to inquire about the deal.

Janice has not identified any red flags that would indicate as a matter of law the appellees' reliance on Larry's representations was not justifiable. *Cf. Orca Assets*, 546 S.W.3d at 660 (concluding no justifiable reliance as matter of law given

63

numerous red flags, company's sophistication in oil and gas industry, and direct contract contradiction).

*Reasonable Diligence*

Next, Janice argues that the appellees' reliance was not justifiable as a matter of law because they had a duty to use reasonable diligence in protecting their own interests. *See Barrow-Shaver*, 590 S.W.3d at 497 (recognizing "long-standing principle" that party claiming fraud has duty to use reasonable diligence to protect his own affairs). She recites the same arguments discussed above: the appellees did not check the Railroad Commission's website and they did not ask a lawyer or CPA to review their contracts. She also notes that the appellees did not check the Secretary of State's website to determine what legal entities Larry had established, but she does not explain how doing so was necessary to protect their interests or how that would have uncovered Larry's fraud regarding the Dewbre deal.

For the reasons we have given previously, Janice has not established that reasonable diligence would have uncovered the fraud as a matter of law, so it was for the factfinder to determine whether the appellees acted with reasonable diligence and whether reasonable diligence would have uncovered the fraud. *Hooks*, 457 S.W.3d at 61. Here, the trial court found the action the appellees took was reasonable and reasonable diligence would not have uncovered Larry's fraud because he concealed that the deal failed and actively misled them for years. The trial court

heard the appellees' testimony that they did not contact attorneys or CPAs or the Railroad Commission, even though they could have, but the trial court also heard their testimony that Larry represented the Dewbre deal had closed, was doing well, and was generating returns.

Janice points out that the contracts the appellees signed were missing exhibits, but that factor alone does not necessarily negate justifiable reliance as a matter of law. *See O'Brien v. Daboval*, 388 S.W.3d 826, 843 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (plaintiff could justifiably rely on financial statement that referenced other documents, without seeing other documents, in light of all circumstances). She also notes that the appellees never received any deeds of oil and gas interests or commissions, but we note once again that the appellees did not personally invest in Dewbre Production and would not have expected to receive these personally. They did receive, from Larry's company, what they believed to be investment returns.

Janice also argues that the contracts the appellees signed describe specific oil wells and provide enough information that a simple search on the Secretary of State's or Railroad Commission's website would have protected their affairs. She introduced into evidence several earlier contracts the appellees signed with one of Larry's companies before rolling over their interest to Citadel. These contracts refer to specific wells, such as "the #1 Meitezn, #1 Janak[,] and #1 Paul" and "the #1 Paul, #1 Wells[,] and #2 Wells." The contracts do not describe the wells in any more detail.

We disagree that this information would have yielded any fruitful search results on the Secretary of State's or Railroad Commission's websites that would have protected the appellees' interests and uncovered Larry's fraud. Further, the appellees had no reason to search these websites for information about the wells because Larry told them, and they had evidence to believe, their investment interests were doing well.

Janice has not demonstrated that the appellees did not act with reasonable diligence to protect their own affairs, and thus she has not demonstrated that a lack of reasonable diligence negates their justifiable reliance as a matter of law. *Cf. Orca Assets*, 546 S.W.3d at 660 (concluding no justifiable reliance as matter of law because company did not exercise reasonable diligence in light of numerous red flags, company's sophistication in oil and gas industry, and direct contract contradiction).

*Confidence in the Other Party*

Next, citing *Barrow-Shaver*, Janice argues that the appellees' reliance was not justifiable because their "failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *See Barrow-Shaver*, 590 S.W.3d at 497 (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962)); *see also Orca Assets*, 546 S.W.3d at 654. She cites the appellees' testimony in which they stated that they trusted Larry and considered him a friend. These facts alone do

not negate justifiable reliance. Here, there is evidence that the appellees relied on more than their friendship with Larry in believing the Dewbre deal had closed: they signed contracts that appeared to be buying a small ownership interest in one of Larry's companies that was supposed to be closing the Dewbre deal, Larry invited them and their wives to a celebratory dinner to commemorate the Dewbre deal closing, and they began receiving purported returns from Citadel's investment in the Dewbre deal.

Again, Janice has not demonstrated that the appellees did not act with reasonable diligence to protect their own affairs, and thus she has not demonstrated that a lack of reasonable diligence negates their justifiable reliance as a matter of law, even though they considered Larry a friend. *Cf. Barrow-Shaver*, 590 S.W.3d at 501 (concluding no justifiable reliance as matter of law because "savvy participant" should have recognized red flags and contract contradiction instead of "rely[ing] blindly" on oral representations); *Orca Assets*, 546 S.W.3d at 660 (concluding no justifiable reliance as matter of law because company did not exercise reasonable diligence in light of numerous red flags, company's sophistication in oil and gas industry, and direct contract contradiction).

*Reliance on Larry's Representations Despite Alarming Facts*

Lastly, similar to the other arguments she has already raised, Janice argues the appellees' reliance was not justifiable because they relied on Larry's representations

when the facts should have alarmed them, again citing *Barrow-Shaver*. *See Barrow-Shaver*, 590 S.W.3d at 497–98 (describing *Orca Assets*, in which Supreme Court concluded there was no justifiable reliance because plaintiff "should have been alarmed" by non-standard contract provision and contradictory oral representations).

Though Janice relies on *Barrow-Shaver*, in that case the Texas Supreme Court explained that a plaintiff "may not 'blindly rely on a representation by a defendant' when the plaintiff's *knowledge, experience, and background* alert it to investigate the defendant's representations before acting in reliance on those representations." *Id.* at 497 (quoting *Orca Assets*, 546 S.W.3d at 654) (emphasis added). Janice has not identified anything specifically about the appellees' knowledge, experience, or background that should have alerted them to investigate Larry's representations.

We have already addressed and dismissed the majority of Janice's arguments here: that the appellees relied on Larry's representations despite red flags, that the appellees could have inquired about Larry from other sources, that Larry's representations directly contradict the fraudulently procured contracts, and that the income statements sent with the purported checks from the Dewbre deal do not mention the Dewbre deal.

Janice cites in particular one email Larry sent in April 2011, in which he wrote, "[A]ll you really want to hear is the closing date on Dewbre. [I c]annot give it to you until the lender has reviewed and approved the two items mentioned above."

68

The email shows that, as of April 2011, the Dewbre deal had not yet closed, but it is far from conclusive proof that the appellees knew the Dewbre deal never closed or that their reliance on Larry's representations was unjustifiable.

\* \* \*

In sum, Janice has failed to prove that the appellees' reliance on Larry's representations was not justifiable as a matter of law. Except for the damages element, discussed below, Janice has not challenged any other elements of the appellees' fraud claim.

## B. Damages

Janice next argues there is no evidence of damages for the appellees' fraud claim. There is no evidence, she argues, to support the out-of-pocket damages the trial court awarded because the appellees were seeking the amount they hoped to receive if their investment had been successful.

### 1. Applicable Law

Damages are another element of fraud a plaintiff must establish to prevail. *See id.* at 496 (to establish fraud, plaintiff must show among other things that plaintiff justifiably relied on defendant's false representation, "which caused the plaintiff injury").

There are two measures of direct damages for fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. *Formosa Plastics Corp. USA v.*

*Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). The out-of-pocket measure is based on the "difference between the value paid and the value received," while the benefit-of-the-bargain measure is based on "the difference between the value as represented and the value received." *Id.*

### 2. Analysis

We disagree with Janice's characterization of the appellees' damages. She asserts that the appellees sought the value of what their investment would have earned if it had succeeded (benefit-of-the-bargain damages), but the appellees only ever sought the return of the money they gave to Larry, less the money that Larry had already paid them (out-of-pocket damages). The appellees did not seek the value of what the Dewbre deal would have earned over ten years if it had closed. And they provided more than sufficient proof of their out-of-pocket damages, at least enough evidence to support the trial court's award.

The appellees provided copies of checks and wire transfers to establish that Fauth transferred $820,000 to Larry and Cooper transferred $640,000 to Larry. Larry returned $67,476.87 to each Fauth and Cooper through the checks purportedly from the Dewbre deal. Fauth and Cooper sought the difference between those two amounts: $752,523.13 for Fauth and $572,523.13 for Cooper.[2] Thus, the appellees

---

[2] The trial court's amended final judgment awarded Cooper $572,573.13. The record does not indicate why this amount is slightly different from the calculated amount, but no party has raised this issue.

70

provided at least some evidence to establish their out-of-pocket damages, the difference between the amount they paid Larry and the amount they received. *See Formosa Plastics*, 960 S.W.2d at 49 (out-of-pocket damages are difference between value paid and value received). Thus, there is legally sufficient evidence. *See Wilson*, 168 S.W.3d at 810 (stating court will sustain no-evidence challenge if there is complete absence of evidence of vital fact or less than scintilla of evidence); *King Ranch*, 118 S.W.3d at 751 (stating more than scintilla of evidence exists when evidence rises to level enabling reasonable people to differ in their conclusions).

## C. Unjust Enrichment

Next, Janice argues the appellees' unjust enrichment claim sounds in fraud and fails for the same reasons as their fraud claim. But we have already concluded the record supports the trial court's judgment on the appellees' fraud claim. When, as here, a judgment rests on multiple theories of recovery, we need not address each cause of action if any one theory is valid. *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 870 (Tex. App.—Dallas 2008, no pet.); *see also* TEX. R. APP. P. 47.1 (appellate

---

In the initial application for removal of Janice as independent administrator, Cooper claimed his interest in the estate was in the amount of $572,523.13. A few pages later in that same document, however, he states he filed a claim against the estate in the amount of $572,573.13, which may have been a simple typographical error. The appellees' original petition also states that Cooper's claim against the estate was in the amount of $572,573.13. The trial court's amended final judgment awarded Cooper this amount. Because there is some evidence to support the trial court's award of damages and no party has raised this issue, it does not affect our disposition.

court's written opinion need not address issues unnecessary to final disposition of appeal).

* * *

In sum, we conclude the appellees' reliance on Larry's representations was not unjustifiable as a matter of law, and there is more than a scintilla of evidence to support the appellees' claim for damages. Because the record supports the trial court's judgment on the appellees' fraud claim, we need not address their unjust-enrichment claim. We overrule Janice's third issue.

## III. Fraudulent Transfer of GEM Interest

Janice argues there is no evidence, or factually insufficient evidence, that Larry intended to defraud his creditors when he transferred his interest in GEM to Janice before he died. She also asserts that the appellees were not Larry's creditors because any claims they had were barred by limitations.

### A. Applicable Law

The Uniform Fraudulent Transfer Act prevents debtors from defrauding creditors by placing assets beyond the creditors' reach. *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016); *see* TEX. BUS. & COM. CODE §§ 24.001–.013. A creditor may sue to void a fraudulent transfer to the extent necessary to satisfy the creditor's claim. TEX. BUS. & COM. CODE § 24.008(a)(1).

72

To prove a transfer was fraudulent and void the transfer under the Act, a claimant must show: (1) he is a creditor, meaning he has a claim against the debtor; (2) the creditor's claim arose before or within a reasonable time after the debtor transferred the assets; and (3) the transfer was made with the "actual intent to hinder, delay, or defraud the creditor." *See Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 204–05 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *see also* TEX. BUS. & COM. CODE § 24.005(a)(1) (transfer by debtor is fraudulent as to creditor, whether creditor's claim arose before or within reasonable time after transfer was made, if debtor made transfer "with actual intent to hinder, delay, or defraud" creditor).

Under the Act, a "creditor" is any person who has a "claim." TEX. BUS. & COM. CODE § 24.002(4). A "claim" is the "right to payment or property." *Id.* § 24.002(3). An "asset" is the debtor's "property," which is "anything that may be the subject of ownership." *Id.* § 24.002(2), (10).

In determining whether a debtor made a transfer with actual intent to hinder, delay, or defraud a creditor, we consider whether certain "badges of fraud" are present, including whether the transfer was to an "insider," meaning a spouse or relative; whether the transfer was of substantially all the debtor's assets; and whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred. *Id.* § 24.002(7), (11) (defining "insider" and

73

"relative"); *id.* § 24.005(b)(1), (5), (8) (listing factors to consider in determining actual intent); *Nwokedi*, 428 S.W.3d at 203 (describing Section 24.005(b) factors as "badges of fraud").

The existence of actual intent is a question of fact. *Hahn v. Love*, 321 S.W.3d 517, 525–26 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Often, direct proof of actual intent is not available, so the factfinder may consider circumstantial evidence, including the badges of fraud listed in the Act. *Mladenka v. Mladenka*, 130 S.W.3d 397, 405 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see* TEX. BUS. & COM. CODE § 24.005(b). The presence of several badges of fraud can support a finding of actual intent. *Wohlstein v. Aliezer*, 321 S.W.3d 765, 777 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

## B. Analysis

The trial court found that Larry transferred his interest in GEM, "his most valuable asset," to Janice weeks before his death knowing that his creditors would soon discover his fraud, and he received no consideration for the transfer. The trial court found the transfer was "essentially a transfer of the substantial majority of [Larry's] assets in exchange for nothing." Thus, the trial court found Larry had an intent to defraud, and the trial court voided Larry's transfer of his interest in GEM and brought the interest back into Larry's estate.

### 1. Creditors

Janice first argues that the appellees are not creditors of Larry's estate because they do not have a valid claim against it—their claim is barred by limitations. As we have already discussed, the appellees' claim is not barred by limitations, and they are creditors of Larry's estate because they have a claim against the estate. *See* TEX. BUS. & COM. CODE § 24.002(3), (4) (defining "creditor" as person with claim and "claim" as right to payment or property).

### 2. Claim Arose Before or Reasonable Time After Transfer

Janice next argues that the transfer could only be fraudulent if the creditor's claim arose within a reasonable time after the transfer was made, and the appellees' claim for their 2011 investments did not arise within a reasonable time before or after the transfer. *See* TEX. BUS. & COM. CODE § 24.005(a). But Section 24.005(a) says that a transfer can be fraudulent "whether the creditor's claim arose *before or within a reasonable time after* the transfer was made." *Id.* (emphasis added). Whether the appellees' claim arose in 2011, as Janice argues, or in 2020, when they actually learned of Larry's fraud, the appellees can satisfy the statute. Larry transferred his interest in December of 2019. If their claim arose in 2011, then the claim arose *before* Larry made the transfer. If their claim arose in 2020, then it arose *within a reasonable time after* Larry made the transfer. Either way, the appellees'

75

claim arose before or a few weeks after Larry made the transfer, as described by Section 24.005(a).

### 3. Actual Intent to Hinder, Delay, or Defraud

Next, Janice argues there is no evidence that Larry had actual intent to hinder, delay, or defraud. We disagree. While direct proof of actual intent is usually not available, the badges of fraud listed in the Act can serve as circumstantial evidence to support a finding of actual intent. *Wohlstein*, 321 S.W.3d at 777; *Mladenka*, 130 S.W.3d at 405; *see* TEX. BUS. & COM. CODE § 24.005(b) (listing badges of fraud to consider in determining actual intent).

There is evidence of at least three badges of fraud. First, Larry's transfer of his interest in GEM was to his spouse, who is an "insider" under the statute. *See* TEX. BUS. & COM. CODE § 24.005(b)(1) (consideration given to whether transfer was to "insider"); *id.* § 24.002(7), (11) (defining "insider" to include relative and defining "relative" to include spouse, respectively). Second, the transfer was of Larry's most valuable asset. The appellees and Janice agree Larry claimed to have invested millions of dollars in HELA, which is GEM's primary investment. The rest of his estate is small in comparison—Janice testified the total value of Larry's estate is $64,364.30, and there are no assets of value left in the estate to pay creditors. Thus, the millions Larry claimed to have invested in GEM and HELA compared to the value of the rest of his estate show he transferred nearly all of his assets to his wife.

76

*See id.* § 24.005(b)(5) (consideration given to whether transfer was of substantially all of debtor's assets). Third, Larry received no consideration for the transfer. *See id.* § 24.005(b)(8) (consideration given to whether value received by debtor was reasonably equivalent to value of asset transferred). Thus, there is at least some evidence of several badges of fraud, which are indicators of actual intent to defraud a creditor. *See Wohlstein*, 321 S.W.3d at 777; *Mladenka*, 130 S.W.3d at 405.

There is more than a scintilla of evidence that the appellees are creditors of Larry's; that their claim arose before or a reasonable time after he transferred assets; and that he made the transfer with actual intent to hinder, delay, or defraud the creditors. *See* TEX. BUS. & COM. CODE § 24.005(a)(1); *Nwokedi*, 428 S.W.3d at 204–05. Therefore, there is legally sufficient evidence to support the trial court's finding that the transfer was fraudulent. *See Wilson*, 168 S.W.3d at 810 (stating court will sustain no-evidence challenge if there is complete absence of evidence of vital fact or less than scintilla of evidence); *King Ranch*, 118 S.W.3d at 751 (stating more than scintilla of evidence exists when evidence rises to level enabling reasonable people to differ in their conclusions).

Regarding the factual sufficiency of the evidence, there is at least some evidence that Larry's transfer of his interest in GEM was fraudulent, and the only evidence to the contrary is Janice's testimony that Larry's transfer was to provide for her in case something happened to him. The evidence supporting the trial court's

finding that the transfer was fraudulent is not so weak as to make the judgment clearly wrong and unjust. *See Figueroa*, 318 S.W.3d at 59 (in factual sufficiency challenge we consider and weigh all evidence and set aside judgment only if evidence supporting finding is so weak as to make judgment clearly wrong and manifestly unjust).

### 4.    Unperfected Interest

Lastly, Janice argues that Larry could only transfer what he owned, and he owned an unperfected interest in GEM. She asserts that after Larry's death, she returned that interest to GEM, and, in a separate conveyance, GEM gave her a minority, non-voting, non-capital contributing interest. She argues the trial court had no authority to void this separate interest.

Robert Painter, Larry's business associate and GEM's attorney, testified that Donald Wiese, another business associate of Larry's, and Larry each agreed to fund 50 percent of the capital contributions for GEM's business activities. But Larry never funded his capital contribution, so GEM claimed Larry only had an "unperfected interest" in GEM. Painter testified:

> [I]t was GEM's position that Larry Ewers left to Ms. Ewers an unperfected interest in GEM because Mr. Ewers had not funded his significant—any part of his significant capital contribution that he had promised.
> As a result, the company, GEM, and Ms. Ewers entered into an agreement whereby the—and I'm going to just describe it generally—Mr. Ewers' voting and capital-contributing shares were returned to the company and Ms. Ewers was assigned separate non-voting—a small

78

minority or a smaller minority interest that are non-voting, non-capital contributing shares.

Janice asserts that the interest in GEM she owns now is unrelated to the interest Larry transferred to her, which she returned to the company. She asserts that, in a separate agreement, for no consideration, she was given a small minority interest in GEM. Painter confirmed that Janice never made a capital contribution to, purchased shares in, or purchased an ownership interest in GEM or HELA. Yet she was given a minority interest based on non-voting, non-capital contributing shares that, if HELA makes a profit, would entitle her to a portion of the profits. Painter testified:

> It's GEM's position that [Janice's] interest did not originate with [Larry] because [Larry] had not perfected his interest. It's GEM's position that the shares, the non-voting, non-capital contributing shares that—sorry—the non-voting, non-contributing interest that Ms. Ewers now holds did not originate with the Ewers'—the Larry Ewers' shares. They're just a separate conveyance.

But the trial court, as factfinder, was entitled to disbelieve Painter's testimony that GEM, for no payment or consideration, gave Janice a profit-bearing interest in the company. *Wilson*, 168 S.W.3d at 819 (factfinder is sole judge of credibility of witnesses and weight to give their testimony and may choose to disbelieve witness). From the evidence presented, the trial court could conclude that Janice's current interest originated from Larry's interest in GEM, which he transferred to her before his death. The trial court did not err in voiding Larry's fraudulent transfer of his

79

interest in GEM and Janice's subsequent interest and returning that asset to Larry's estate.

* * *

We conclude there was both legally and factually sufficient evidence to support the trial court's finding that Larry's transfer of his interest in GEM to Janice was fraudulent as to his creditors. We overrule this issue.

## IV. Removing Janice as Independent Administrator

In her next issue, Janice argues the trial court erred in finding she had a material conflict of interest as the independent administrator of Larry's estate and in removing her as independent administrator.

### A. Applicable Law

Generally, an independent administrator may administer the assets of an estate with minimal court supervision. *See, e.g.*, *Eastland v. Eastland*, 273 S.W.3d 815, 821 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (discussing purposes of independent administration under former Probate Code, now Estates Code). Section 404.0035 of the Estates Code lists certain factors for which a court may remove an independent administrator after her appointment.

A court may remove an independent administrator if she "becomes incapable of properly performing [her] fiduciary duties due to a material conflict of interest."

80

TEX. EST. CODE § 404.0035(b)(4).[3] A conflict of interest is "material" if it is "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential." *Material*, BLACK'S LAW DICTIONARY (11th ed. 2019).

In a different context, this court has decided an administrator's claims to the decedent's property, to the exclusion of the estate, can present such a conflict of interest as to render that person unsuitable to serve as administrator as a matter of law. *Pine v. deBlieux*, 360 S.W.3d 45, 51 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). "[W]hen an administrator or executor claims title to property owned by the testator at the time of death, the interest of the estate and that administrator or executor are too adverse for that one person to advocate effectively for both sides." *Id.* at 49. But the issue in *Pine v. deBlieux* was a potential administrator's unsuitability, which is a "more expansive disqualification standard" than the enumerated factors in Section 404.0035 for the removal of an administrator post-appointment.[4] *See id.* at 51. Still, *Pine*'s conflict-of-interest discussion is relevant to our analysis.

---

[3]     Section 404.0035 of the Estates Code refers to an "independent executor," but the term "independent executor" includes an independent administrator. TEX. EST. CODE § 22.017 ("'Independent executor' . . . includes an independent administrator.").

[4]     As the Texas Supreme Court has explained:

> [T]he grounds to *remove* an independent executor *post*-appointment are different from those to *disqualify* an executor *pre*-appointment. [Section 304.003 of the Estates Code] sets out five different bases for

The party seeking removal of an independent administrator—here, the appellees—has the burden to establish a violation of Section 404.0035 of the Estates Code. *See Kappus v. Kappus*, 284 S.W.3d 831, 835 (Tex. 2009) (referring to Section 404.0035's predecessor statute in former Probate Code). Once the violation has been proven, the trial court has discretion to determine whether that violation warrants removal. *Id.* We review the trial court's order removing an independent administrator for abuse of discretion. *In re Estate of Collins*, 638 S.W.3d 814, 819 (Tex. App.—Tyler 2021, no pet.). A trial court abuses its discretion when it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Id.*

## B.    Analysis

Janice asserts there is no evidence, or factually insufficient evidence, that she has a material conflict of interest that affects her ability to fairly administer Larry's estate.

In its findings of fact and conclusions of law, the trial court found Janice was incapable of performing her duties as independent administrator because she had a material conflict of interest: she claimed ownership of Larry's interest in GEM, and

---

disqualification of a would-be executor, including '[a] person whom the court finds unsuitable.' In contrast to this catch-all standard that confers broad trial-court discretion, [Section 404.0035] lists . . . specific grounds for removal, none quite as expansive as unsuitability.

*Kappus v. Kappus*, 284 S.W.3d 831, 835 (Tex. 2009) (third alteration in original) (footnote omitted) (references to former Probate Code updated to Estates Code).

she did not list or disclose to the trial court Larry's transfer of his interest in GEM to her. The trial court concluded that Janice should be removed as independent administrator.

Janice asserts that she did not list or disclose the transfer of GEM in the estate inventory because Larry transferred his interest to her before he died, so she in good faith did not believe it to be an estate asset.[5] She argues that estate assets do not include property the decedent sold or transferred before death. Even though Janice may have acted in good faith at the time, and there is no evidence to the contrary, the trial court has since voided the transfer of GEM, as discussed above. Janice directly claims ownership of an estate asset, an interest that is "too adverse for that one person to advocate effectively for both sides." *See Pine*, 360 S.W.3d at 49. Thus, Janice's ownership claim in GEM is evidence of a conflict of interest.

There is also evidence to support the finding that this conflict of interest is material. Both Janice and Robert Painter testified that GEM could become profitable in the future, and the trial court found that GEM "may have substantial value and may generate income" once HELA becomes profitable. Janice also testified that there were no other assets of value in the estate to pay creditors' claims. Thus, this

---

[5] Janice also argues that she, in good faith, denied the appellees' claims against the estate based on limitations. Their claims may have appeared to have been barred by limitations on their face, so we do not dispute that Janice initially denied the claims in good faith. However, we have already discussed why the appellees' claims are not barred by limitations, so we do not repeat the issue here.

conflict of interest is enough to be significant and essential, meaning it is a material conflict of interest. *See Material*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "material" as "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential.").

Janice cites the factors the Texas Supreme Court discussed in *Kappus v. Kappus* to argue she does not have a conflict of interest. *See Kappus*, 284 S.W.3d at 837–38 (in deciding whether administrator's conflict of interest amounts to "gross misconduct or gross mismanagement," courts should consider size of estate, degree of actual harm to estate, administrator's good faith in asserting claim for estate property, decedent's knowledge of conflict, and administrator's disclosure of conflict). But the issue before the Court in *Kappus* was whether the administrator's conflict of interest necessarily rose to the level of "gross misconduct or gross mismanagement" because at that time, the independent administrator removal statute did not include a material conflict of interest provision.[6] Thus, the *Kappus* factors are inapposite.

There is more than a scintilla of evidence to support the trial court's finding that Janice had a material conflict of interest as independent administrator; thus,

---

[6]    The legislature added the material conflict of interest provision in 2011, two years after the Court decided *Kappus*. Act of May 29, 2011, 82nd Leg., R.S., ch. 1338 (S.B. 1198), § 1.25, sec. 149C(a)(7), 2011 Tex. Gen. Laws 3882, 3897 (adding "material conflict of interest" to grounds for removal of independent executor).

there is legally sufficient evidence. *See Wilson*, 168 S.W.3d at 810 (stating court will sustain no-evidence challenge if there is complete absence of evidence of vital fact or less than scintilla of evidence); *King Ranch*, 118 S.W.3d at 751 (stating more than scintilla of evidence exists when evidence rises to level enabling reasonable people to differ in their conclusions).

Regarding the factual sufficiency of the evidence, the only contrary evidence Janice cites is the fact that her interest in GEM has no value presently, so she claims she does not have a material conflict of interest. Janice and Robert Painter testified that the fair market value of Larry's interest in GEM was zero at the time of his death. Janice argues that, although the interest in GEM has the potential to be profitable in the future, a *potential* conflict of interest is not a material conflict. We disagree that the asset's present value makes her conflict of interest less significant when there is evidence that the asset is worth millions and could be extremely profitable in the future. Janice herself testified that if HELA makes a profit, her interest in GEM would entitle her to receive a portion of the profits, and Painter agreed, although he was reluctant to state the percentage of her interest or the amount she would receive. The evidence supporting the trial court's finding that Janice had a material conflict of interest is not so weak as to make the judgment clearly wrong and unjust. *See Figueroa*, 318 S.W.3d at 59 (in factual sufficiency challenge we

85

consider and weigh all evidence and set aside judgment only if evidence supporting finding is so weak as to make judgment clearly wrong and manifestly unjust).

The trial court, having found legally and factually sufficient evidence of a material conflict of interest, did not abuse its discretion in removing Janice as independent administrator. *See Kappus*, 284 S.W.3d at 835 (stating that once violation of removal statute is proven, trial court has discretion to determine whether violation warrants administrator's removal). We overrule this issue.

## V. GEM as Larry's Alter Ego

In her sixth issue, Janice argues there was no evidence to support the trial court's finding that GEM was Larry's alter ego. She asks us to modify the final judgment to delete this finding.

The appellees have not disputed this point. Whereas the trial court made multiple findings of fact regarding Larry's use of Citadel and EPD as his alter egos, the trial court made no such findings of fact regarding GEM. Larry was a co-owner of GEM, not the sole owner. There is some evidence that he used GEM funds improperly,[7] but there was no other evidence that he used GEM as his alter ego. Alter

---

[7] Robert Painter testified that Larry made significant transfers—about $50,000 a month in 2019—from GEM's checking account into a bank account Larry used for both personal and business expenses, but those transactions were unauthorized. He explained:

> These were unauthorized transfers that Mr. Ewers made from the GEM checking account that the GEM members and manager, Mr. Wiese, and I discovered after his passing. . . . Mr. Ewers had authority

86

ego is a theory by which a corporation's owner may be held personally liable for the corporation's liabilities—also known as piercing the corporate veil—if the claimant can show the owner used the corporation "as a mere tool or business conduit" for illegitimate purposes. *See, e.g.*, *Durham v. Accardi*, 587 S.W.3d 179, 185 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

We therefore sustain Janice's sixth issue and modify the trial court's amended final judgment to delete the language finding "Green Energy Minerals LLC" to be Larry's alter ego.[8] *See, e.g.*, *Stauffacher v. Coadum Cap. Fund 1, LLC*, 344 S.W.3d 584, 592 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (modifying trial court's judgment to delete award based on claim for which there was no evidence and affirming as modified); *Bennett v. Cochran*, No. 14-00-01160-CV, 2004 WL 852298, at *7 (Tex. App.—Houston [14th Dist.] Apr. 22, 2004, no pet.) (mem. op.) (same); *see also* TEX. R. APP. P. 43.2(b) (court of appeals may modify trial court's judgment and affirm as modified).

---

to withdraw from the GEM checking account for expenses that were paid to Aqua [Dulce] or HELA and for no other purpose. He did not have authority, which was required per the agreements of the members of GEM, to withdraw any funds from the GEM checking account for deposit into his personal account . . . .

[8]     We therefore do not reach the second part of Janice's argument, that the alter ego finding as to GEM must be vacated because the appellees did not sue GEM.

## CONCLUSION

We modify the trial court's judgment by deleting the language stating Green Energy Minerals LLC was an alter ego of Larry Ewers.

We affirm the judgment as modified.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Countiss, and Farris.

Justice Countiss, dissenting.